### RICE *vs.* RAILROAD COMPANY.

1. If Congress pass an act granting public lands to a Territory to aid in making a railroad, and if, by the true construction of the act, the Territory acquired any beneficial interest in the lands as contradistinguished from a mere naked trust or power to dispose of them for certain specified uses and purposes, the act is irrepealable, and a subsequent act attempting to repeal it is void.

2. If the Legislative Assembly of the Territory, in an act incorporating a company to make the railroad which Congress intended to aid by the grant, conferred upon the company any right, title, or interest in the lands granted by Congress, it is not competent for Congress afterwards to repeal the grant and divest the title of the company.

3. Where it appears that the Territorial act of incorporation was passed *before* the grant was made by Congress, and that *after* that grant the act of incorporation was re-enacted with certain modifications,

the re-enactment gives to the railroad corporation such title as the Territory was capable at that time of conferring.

4  Bu' if the grant was revoked, or the act making it repealed, before the re-enactment of the charter, the title of the company must depend on the validity of the repealing act.

5. The original act of incorporation, passed by the Territorial Legislature, being before the grant by Congress to the Territory, did not operate as a valid grant to the company so as to vest in it a title to the lands, when subsequently granted.

6. Legislative grants are not warranties, and the rule of the common law must be applied to them, that no estate passes to the grantee except what was in the grantor at the time.

7. While the Federal courts have no common law jurisdiction, not conferred by statute, and their rules of decision are derived from the laws of the States, still, in construing acts of Congress, the rules of interpretation furnished by the common law are the true guides, and have been uniformly followed.

8. In ascertaining the meaning or effect of a State statute, the rules of construction are borrowed from the common law, except in cases where the courts of the State have otherwise determined.

9. An act of Congress granting land to a Territory, to be held for the purpose of making, or aiding to make, a public improvement of general interest, and restricting the use to that one purpose, does not pass to the Territory a beneficial interest *in presenti.*

10. If the grant be coupled with a provision that the lands shall be subject to the disposal of the Territorial Legislature, for the public purpose specified *and no other*, and shall not inure to the benefit of any company *heretofore constituted and organized*, it is clear that *future* legislation of the Territory alone could dispose of the lands, even for the purpose declared.

11. Where the act of Congress making the grant declares that no title shall vest in the Territory, nor no patent issue for any part of the lands until twenty miles of the railroad be finished, these words cannot be rejected or disregarded, or shorn of their ordinary signification, unless they be so clearly repugnant to the rest of the act that the whole cannot stand together.

12. Such words are not necessarily repugnant to, or inconsistent with, the word *grant* used in the same and in previous sections of the act.

13. The word *grant* is not a technical word, like *enfeoff*, and although, if

used broadly and without limitation, it will carry an estate in the thing granted, yet, if used in a restricted sense, the grantee will take but a naked trust for the benefit of the grantor.

14. Words which, standing alone in an act of Congress, may properly be understood to pass a beneficial interest in land, will not be regarded as having that effect, if the context shows that they were not intended to be so used.

15. Legislative grants must be interpreted, if practicable, so as to effect the intention of the grantor; but if the words are ambiguous, th true rule is to construe them most strongly against the grantee.

16. Wherever privileges are granted to a corporation, and the grant comes under revision in the courts, it is to be construed strictly against the corporation and in favor of the public, and nothing passes except what is given in clear and explicit terms.

Error to the District Court of the United States for the district of Minnesota.

Edmund Rice brought trespass in the county court of Dakota, Territory of Minnesota, against the Minnesota & Northwestern Railroad Company, for cutting timber on section 15 of township 114 north, of range 19 west. The defendants answered that the title to the section of land described in the plaintiff's complaint was in them, and set forth their title as follows:

The defendants were incorporated on the 4th of March, 1854, by the Legislative Assembly of Minnesota Territory, for the purpose of making a railroad from the northwest shore of Lake Superior to some point to be selected on the northern line of Iowa in the direction of Dubuque. This act of incorporation provided, among other things, that, "for the purpose of aiding the said company in the construction and maintaining the said railroad, it is further enacted that any lands that may be granted to the said Territory to aid in the construction of the said railroad shall be, and the same are hereby, *granted in fee simple, absolute, without any further act or deed;* and the Governor of this Territory or future State of Minnesota is hereby authorized and directed, in the name and in behalf of said Territory or State, after the said grant of land shall have been made by the United States to said Territory, to execute and deliver to said

company such further deed or assurance of the transfer of the said property as said company may require, to vest in them a perfect title to the same: provided, however, that such lands shall be taken upon such terms and conditions as may be prescribed by the act of Congress granting the same." The books of subscription were opened at St. Paul and New York. Stock was subscribed to a large amount; the requisite proportion of it was paid in, and the company was organized agreeably to the terms of the charter. On the 29th of June, 1854, an act was passed by Congress granting to the Territory of Minnesota, for the purpose of aiding in the construction of a railroad along the route mentioned in the charter, every alternate section of land, designated by odd numbers, for six sections in width on each side of said road within the Territory. The act of Congress making the grant was as follows:

"1. *Be it enacted, &c.*, That there is hereby granted to the Territory of Minnesota, for the purpose of aiding in the construction of a railroad from the southern line of said Territory, commencing at a point between township ranges 9 and 17, thence by the way of St. Paul, by the most practicable route, to the eastern line of said Territory, in the direction of Lake Superior, every alternate section of land, designated by odd numbers, for six sections in width on each side of said road within said Territory; but in case it shall appear that the United States have, when the line of said road is definitely fixed by the authority aforesaid, sold any section or any part thereof granted as aforesaid, or that the right of pre-emption has attached to the same, then it shall be lawful for any agent or agents to be appointed by the Governor of said Territory, subject to the approval of the Secretary of the Interior, to select from the lands of the United States, nearest to the tier of sections above specified, so much land in alternate sections or parts of sections as shall be equal to such lands as the United States have sold, or to which the right of pre-emption has attached as aforesaid, which land (thus selected in lieu of those sold, and to which pre-emption has attached as aforesaid, together with the sections or parts of sections designated by odd numbers as aforesaid, and appropriated as aforesaid) shall be held by the Ter-

ritory of Minnesota for the use and purpose aforesaid: *Provided*, That the lands to be so located shall in no case be further than fifteen miles from the line of the road in each case, and selected for and on account of said road: *Provided, further*, That the lands hereby granted shall be exclusively applied in the construction of that road for which it was granted and selected, and shall be disposed of only as the work progresses; and the same shall be applied to no other purpose whatever: *And provided, further*, That any and all lands heretofore reserved to the United States by an act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatever, be, and the same are hereby, reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the route of said railroad through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the President of the United States.

"SECTION 2. *And be it further enacted*, That the sections and parts of sections of land which by such grants shall remain to the United States, within six miles on each side of said road, shall not be sold for less than double the minimum price.

"SECTION 3. *And be it further enacted*, That the said lands hereby granted to the said Territory shall be subject to the disposal of any Legislature thereof for the purpose aforesaid, and no other; nor shall they inure to the benefit of any company heretofore constituted and organized; and the said railroad shall be and remain a public highway for the use of the United States, free from toll or other charge upon the transportation of any property or troops of the United States; nor shall any of the said lands become subject to private entry until the same shall have been first offered at public sale at the increased price.

"SECTION 4. *And be it further enacted*, That the lands hereby granted to said Territory shall be disposed of by said Territory only in the manner following—that is to say: no title shall vest in the said Territory of Minnesota, nor shall any patent issue for any part of the lands hereinbefore mentioned, until a continuous line of twenty miles of said road shall be com-

pleted through the lands hereby granted; and when the Secretary of the Interior shall be satisfied that any twenty miles of said road are completed, then a patent shall issue for a quantity of land not exceeding one hundred and twenty sections, and included within a continuous length of twenty miles of said road, until it shall be completed; and if said road is not completed within ten years, no further sale shall be made, and the land unsold shall revert to the United States.

"SECTION 5. *And be it further enacted,* That the United States mail shall be transported at all times on said railroad, under the direction of the Post Office Department, at such price as Congress may by law direct: *Provided,* That until such price is fixed by law, the Postmaster General shall have the power to determine the same."

It was before the passage of this act that the books of subscription were opened, namely, on the 1st of May, 1854. On the 20th of the same month subscriptions were made upon the books at St. Paul. On the 30th of June, 1854, the day after the act of Congress making the grant was approved by the President, one million of dollars were subscribed to the stock on the books opened at New York, and ten per cent. thereupon duly paid to the commissioners. Directors were then elected and the company completely organized. Afterwards, on the 16th of February, 1855, the Territorial Legislature made some modifications and additions to the charter and re-enacted it. The defendants further averred, that on the 20th of October, 1855, they caused a survey to be made of their route for the railroad and located it agreeably to the act of incorporation and the act of Congress; that the route as located runs through the land claimed by the plaintiff and described in his complaint; that it was not until after this location, to wit, on the 1st of January, 1856, that the plaintiff purchased the land from the United States, and that the trespass complained of consisted in going on that part of the land where the track of the railroad was lawfully located and cutting such timber as was necessary to be removed for the purpose of constructing the work.

To this answer of the defendants the plaintiff replied, that

after the officers and directors of the company were chosen by the stockholders, and entered upon the discharge of their duties, and before the trespasses complained of were committed, to wit, on the 24th day of August, 1854, Congress passed the following act repealing that by which the grant was made on the preceding 29th of June:

"*Be it enacted*, That the bill entitled 'An act to aid the Territory of Minnesota in the construction of a railroad therein,' which passed the House of Representatives on the twentieth day of June, eighteen hundred and fifty-four, and which was approved by the President of the United States on the twenty-ninth day of June, eighteen hundred and fifty-four, be, and the same is hereby repealed."

The defendants demurred to the replication, and for cause of demurrer set forth that the repealing act of 24th August, 1854, was void and of non effect.

The court of original jurisdiction gave judgment on the demurrer in favor of the plaintiff. The defendants appealed to the Supreme Court of the Territory, where the judgment was reversed, but judgment was not entered for the defendants. By the law admitting Minnesota into the Union as a State the records of the Supreme Court of the Territory were transferred to the District Court of the United States. There an application was made to amend the record by entering a proper judgment, which was done, and this writ of error sued out by the defendants from the Supreme Court of the United States was directed to the judge of the District Court.

Mr. *Noyes*, of New York, and Mr. *Barbour*, of Iowa, for the plaintiffs in error. The act of Congress of June 29, 1854, was *per se* a grant *in presenti* to the Territory of Minnesota of all the lands designated by odd numbers within six miles of the contemplated railroad. It also granted an easement or right of way over all the other public lands upon the route of the railroad. *Sessieur* vs. *Price*, (12 Howard, 59.) By the terms of the act "the land is *hereby granted* to the Territory of Minnesota," and this phrase is repeated several times. The lands are to be "*held* by the Territory," and in a specified event

they shall *revert* to the United States. Reversion signifies the *returning* of the land after a particular estate is ended. Jacobs' Law Dict., Tit. *Reversion.*

It is true the 4th section provides, that "the lands *hereby granted* to said Territory shall be *disposed of* only in manner following—that is to say, *no title shall vest* in the said Territory of Minnesota, nor shall any patent issue," until certain conditions are performed. But this does not annul the grant of a present interest; it merely qualifies the power of disposal.

A grant by Congress is higher evidence of title than a patent. *Grignon* vs. *Astor*, (2 How., 319.) It is equivalent to a conveyance with livery of seisin. *Enfield* vs. *Way*, (11 New. Hamp. Rep., 520;) *Enfield* vs. *Permit*, (5 N. H. Rep., 280;) *Wilcox* vs. *Jackson*, (13 Peters, 498.) All the words of this act are harmonized by construing it as vesting a present interest upon a condition subsequent. Such was the intention of Congress, and the intention overrules all technicalities. *Rutherford* vs. *Green*, (2 Wheaton, 198.)

But if the construction were doubtful, the grantee would be entitled to the benefit of the doubt. The rule is not so in the interpretation of the King's naked grants from pure favor; yet where a consideration is reserved, the rule prevails that a public grant must be construed most favorably to the grantee. Chit. on Prerogative, Chap. 16, sec. 5; Lord Raymond, 32 Bac. Abr. Prerog., F. 2; 17 Viner, 152; 6 Inst., 446; *Mollyn's Case*, (6 Coke's Rep., 5;) *Whistler's Case*, (10 Coke's Rep., 65.) Where a particular certainty precedes, it shall not be destroyed by an uncertainty coming after. Bac. Abr., Tit. Prerog. Here the grant is absolute and certain, with nothing to render it uncertain but the subsequent provision for the manner of disposal.

The act of Congress certainly granted a right of way over the public lands, along the line of the railroad; otherwise the manifest intent of the act would be wholly defeated. It is not to be presumed that Congress meant to make a void grant. *Charles River Bridge Case*, (11 Pet., 592;) *Whistler's Case*, (10 Coke, 65;) *Gayety* vs. *Bethune*, (14 Mass. R., 56;) Com. Dig. Grant, E. 11; ib. G., 12; Co. Litt., 56 *a*; Bac. Abr. Prerog.,

---

---

F. 2, 602; 17 Vin., 153, Title Prerog.; O. C. Pl., 1; id. Pl., 4; id. Pl., 13; *Lord Chandos' Case,* (6 Co. R., 55;) *Atkyn's Case,* (1 Vent., 399, 409;) *Moleyn's Case,* (6 Coke R., 6;) Finch's Law, 100; *Saunders's Case,* (5 Co. R., 12;) Plowden, 317; *Darcy* vs. *Askwith,* (Hobart's R., 234;) *Lyford's Case,* (11 Coke R.; 52;) Bac. Abr., Incidents; Pl. 8, and Nusans Pl., 14; *Allen's Case,* (Owen, 113;) 10 Co. R., 67, 6; Chitty Prerog., Ch. 16, § 5; Lord Raym., 32.

These rules apply with the greater force, because this grant was founded upon a valuable consideration—carrying the mails at the price fixed by Congress, and troops without any charge. "When the King's grants are upon a valuable consideration, they shall be construed favorably to the patentee, for the honor of the King." Bac. Abr. Prerog., Construction of Grants, 5.

Congress had power to make this grant; and the Territory had power to take it. Grants of lands have been made to every Territory from the beginning of the Government, and their validity never questioned. Seventy-two sections were long ago granted to the Territory of Minnesota to establish a university. Can any one doubt the perfect title of the Territory under that grant?

The act of the Territorial Legislature of March 4, 1854, was a valid grant to the defendants of the lands to be granted by Congress. The Legislative Assembly had jurisdiction and authority to make the grant, and to covenant with the defendants that they should have a vested interest when such interest was acquired by the Territory from the United States; and such a covenant the Territory did make with the railroad company. No authority from Congress was necessary, beyond what was vested in the Territorial government by the organic act.

The railroad company fully complied with all the conditions of its charter, but was not yet organized on the 29th of June, 1854. But it was then in a condition to accept the charter. After the passage of the granting act, a million of dollars were subscribed, the officers were elected, and the charter accepted. The company, therefore, became seized of the lands.

The repealing act is void. A grant of land or of a franchise once made by a legislative body cannot be rescinded by the granting power. Charles River Bridge Case; Chitty on Prerog., 132; 3 Kent, 458; *Fletcher* vs. *Peck*, (6 Cr., 87;) *King* vs. *Amery*, (2 T. R., 515.) This is true where the grant is a naked one, and *a fortiori* where it is founded upon a consideration. Here the considerations are—1. The right of the United States to transport troops free of charge. 2. The right to have mails carried at the price fixed by Congress or the Post Office Department. 3. The enhanced value of the even sections, the minimum price thereof being doubled by the act itself. 4. The obligation of the company to build the road, for this obligation may be enforced. *Lyme Regis* vs. *Henley*, (5 B. & Adol., 77; S. C., 5 Bing., 91;) *Reg* vs. *B. & P. Railway Co.*, (9 Car. R., 478; S. C., 6 Jurist, 804;) *Charles River Bridge Case*, (7 Pick., 446, 447, 448;) *Rex* vs. *Hastings*, (1 D. & R., 148; S. C., 5 B. & A., 692, *n*;) *Cohen* vs. *Wilkinson*, (12 Beav., 125; S. C., 13 Jurist, 621.)

If the repealing act be an attempt to take the property for public use, it is void, because it makes no provision for compensation to the owners. *Piscat. Bridge Case*, (7 N. H. Rep., 35;) *Charles River Bridge Case*, (7 Pick., 507;) *Gardner* vs. *Newburgh*, (2 John. Ch. R., 168;) *Perry* vs. *Wilson*, (7 Mass. R., 395;) *Stevens* vs. *Mid. Canal Co.*, (12 id., 468;) *Callendar* vs. *Marsh*, (1 Pick. R., 430;) *Van Horne's Lessee* vs. *Dorrance*, (3 Dall., 304;) *Livingston* vs. *Mayor of N. Y.*, (8 Wend., 85.) If it was the intention simply to divest the owner of his estate, then it is in direct conflict with that provision in the Constitution which declares that no man shall be deprived of his property except by due course of law—that is, by a judical proceeding. *Wilkinson* vs. *Leland*, (2 Peters, 657;) *Taylor* vs. *Porter*, (4 Hill R., 140; 2 Kent's Com., 13;) *Hoke* vs. *Henderson*, (4 Dev. N. C. Rep., 15;) Co. Litt., 2 Inst., 45, 50; *Jones* vs. *Perry*, (10 Yerger, 59.) The repealing act is void also, because it is contrary to the principles of natural justice and equity. *Bonham's Case*, (8 Co., 118;) *Day* vs. *Savage*, (Hobart's R., 87;) *City of London* vs. *Wood*, (12 Mod., 687;) *Bowman* vs. *Middleton*, (1 Bay., 252;) 1 Kent's Com., 451; ib., 448; Smith's Com. on Const., § 158;

*Bates* vs. *Kimball*, (2 Chip. R., 89;) *Merrill* vs. *Sherburne*, (1 N. H. R., 213;) *Wilkinson* vs. *Leland*, (2 Peters, 627.) For these reasons it is submitted that the right of the defendants was perfect to locate their railroad upon the lands in question, and neither the sale to the plaintiff nor the repealing-act of Congress could take that right away.

*Mr. Stevens*, of Michigan, for defendant in error. The Territory of Minnesota was incapable of taking or holding the lands. A Territory has no sovereign authority like that of an independent community. It is within the jurisdiction of the United States, subject to the power of Congress, and has no power except what is specially given it. The Territory of Minnesota, not having received from Congress the special privilege to hold lands, cannot be a grantee. 1 Pet. R., 511; 3 Story on Const., §§ 1316, 1324.

Besides, this act of Congress declares, expressly, that "no title shall vest nor any patent issue" until, &c. These are plain words, and they are not overcome by the previous use of the word grant. That word does not imply a warranty. 2 Greenl. Crui., 735.

This railroad company acquired no rights under the act of the Territorial Legislature, because that body had no power, by its organic act, to create corporations; and because the Territory, at the time when it made its donation to the company "in fee simple," had nothing to grant. It was void, and no estate passed to the grantee, if the grantor had none at the time. Bac. Abr., 514; 2 Humph., 19; 4 Cow., 427; 4 Mass. R., 688; 4 Cruise Dig., 52. The grant being without covenant or warranty, a consideration cannot give title to an estate subsequently acquired by the Territory.

There was no consideration, though the company formally accepted the charter. The corporation could not be compelled to build the road. Neglect or failure to do so would simply work a forfeiture of its franchises. 2 Bac. Abr.; Redfield on Railways, 452; 18 Eng. L. & E. Rep., 199.

Perhaps it might be objected that this company could not take because the act of Congress declares that the lands shall

not inure to the benefit of any corporation "_heretofore consti-tuted and organized._" The plaintiff does not make that point. The company was constituted by its charter, but not organized before the 29th of June, 1854.

But there was no title vested here, either in the Territory or in the railroad company, and Congress had a right to repeal the law. Legislatures have the power always to take away by statute what was given by statute, not divesting the private rights vested in individuals or corporations. _Oriental Bank_ vs. _Freese_, (6 Shep., 109;) _People_ vs. _Livingston_, (6 Wend., 531.) Congress might have repealed the organic act of the Territory itself, and that would have been a resumption of the grant. What Congress could do in that way can surely be done by a direct repeal of the grant itself.

Mr. Justice CLIFFORD. This is a writ of error to the District Court of the United States for the district of Minnesota, bringing up the record of a suit transferred into that court from the Supreme Court of the Territory.

According to the transcript, the suit was commenced by the present plaintiff on the first day of November, 1856, in the District Court for the county of Dakota, before the Territory was admitted as a State. It was an action of trespass; and the complaint contained two counts, each describing a distinct tract of land as the close of the plaintiff. Both tracts, however, as described, comprised a certain part of township number one hundred and fourteen north, of range nineteen west, situate in the county where the suit was brought; and the several acts of trespass complained of were alleged, in each count, to have been committed on the twenty-fifth day of October, prior to the date of the writ.

Service was duly made upon the corporation defendants, and they appeared, and made answer to the suit. Whenever the answer to the suit extended beyond the mere denial of the allegations of the complaint, the law of the Territory required that it should contain " a statement of the new matter constituting the defence or counter claim;" and the defendants

framed their answer, in this case, in conformity to that requirement.

Among other things, they admitted, in the answer, that the plaintiff claimed title to the premises under the United States, by purchase and entry, made on the first day of January, 1856; but averred that they were incorporated by the Territorial Legislature on the fourth day of March, 1854, and set up a prior title in themselves, under the provisions of their charter, and an act of Congress passed on the twenty-ninth day of June, in the same year.

Responding to that claim, the plaintiff replied, that the act of Congress referred to in the answer was repealed on the fourth day of August of the same year in which it was passed.

To that replication the defendants demurred, showing, for cause, that the act of Congress last named was void, and of no effect.

Judgment was entered for the plaintiff in the county court; and thereupon the defendants appealed to the Supreme Court of the Territory, where the judgment of the county court was reversed; but no final judgment in the cause was ever entered in that court.

Pursuant to the act of Congress admitting the Territory as a State, (11 Stat. at Large, 285,) the record of the suit was then transferred to the District Court of the United States created by that act; and the latter court, on the nineteenth day of November, 1858, after supplying an omission in the record of the county court, entered a final judgment in favor of the defendants. Whereupon the plaintiff sued out a writ of error, and removed the case into this court. ·

Possession of the premises having been in the plaintiff at the time the supposed trespasses were committed, and the several acts of trespass complained of being admitted, the controversy must turn upon the sufficiency of the title set up by the defendants. They were incorporated by the Territorial Legislature on the fourth day of March, 1854, as alleged in the answer. Their charter empowered them, among other things, to survey, locate, and construct a railroad from the line of the

State of Iowa to Lake Superior. Authority was also given to the company, in the charter, to secure, in the manner therein pointed out, a right of way for the contemplated railroad, two hundred feet in width, through the entire length of the described route. For that purpose they might purchase the land of the owner, or might enter and take possession of the same, upon paying proper compensation. And the charter also contained the following provision: All such lands * * * and privileges belonging, or which may hereafter belong, to the Territory or future State of Minnesota, on and within said two hundred feet in width, are hereby granted to said corporation for said purposes, and for no other; and for the purpose of aiding the said company in the construction and maintaining the said railroad, it is further enacted, that any lands that may be granted to the said Territory, to aid in the construction of the said railroad, shall be, and the same are hereby, granted in fee simple, absolute, without any further act or deed. Provision was also made for such further deed or assurance of the transfer of the said property as said company might require, to vest in them a perfect title to the same; and to that end, the Governor of the Territory or future State was authorized and directed, "after the said grant of land shall have been made" to the Territory by the United States, to execute and deliver to said company such further deed or assurance, in the name and in behalf of said Territory or State, but upon such terms and conditions as may be prescribed by the act of Congress granting the same.

These references to the act of incorporation will be sufficient, in this connection, except to say, that the corporators named in the first section held a meeting, within the time specified in the act, and voted to accept the charter, and gave notice of such acceptance, as therein required. They also chose a committee, to call future meetings for the organization of the company, and authorized the committee to open books and receive subscriptions for one million dollars of the capital stock. Books of subscription were accordingly opened, under their direction, on the first day of May, 1854, and on the twentieth day of the same month subcriptions were made to the amount

of two hundred dollars, of which an instalment of ten per cent. was duly paid by the subscribers. Congress, on the twenty-ninth day of June, 1854, passed the act entitled "An act to aid the Territory of Minnesota in the construction of a railroad therein," which is the act of Congress referred to in the answer of the defendants. (10 Stat. at Large, p. 302.)

Assuming the allegations of the answer to be correct, subscriptions to the capital stock of the company were made on the following day to the amount of one million of dollars, and an instalment of ten per cent. upon each share so subscribed was duly paid to the committee. Having complied with the conditions of the charter in these particulars, the subscribers to the stock, in pursuance of previous notice given by the committee, met in the city of New York, on the first day of July in the same year, and completed the organization of the company, by the election of twelve directors, and such other officers as were necessary under their charter to effect that object.

Reference will now be made to the act of Congress set up in the replication of the plaintiff, in order that the precise state of facts, as they existed on the fourth day of August, 1854, when the repealing act was passed, may clearly appear.

By that act it was in effect provided, that the bill entitled "An act to aid the Territory of Minnesota in the construction of a railroad," passed on the twenty-ninth day of June, 1854, be, and the same is hereby, repealed. (10 Stat. at Large, 575.) Repealed as the act was at the same session in which it was passed, the defendants had not then procured the amendments to their charter set up in the answer, nor had they then commenced to survey, locate, or construct the railroad therein authorized and described. They had completed the organization of the company under their original charter, at the time and in the manner already mentioned; but they had done nothing more which could have the remotest tendency to secure to them any right, title, or interest in the lands described in the complaint. One of the amendments to their charter, set up in the answer, was passed by the Territorial Legislature on the seventeenth day of February, 1855, and the other on the first day of March, 1856—more than a year and a half after the act of Con-

gress in question had been repealed. Survey of the route and location of the railroad were made on the twentieth day of October, 1855; and the defendants admitted that the location included the parcels of land in controversy, and that they went upon the same at the time alleged, and cut down and removed the trees from the track of the railroad, as alleged in the complaint.

Most of the facts here stated are drawn from the answer of the defendants; but, inasmuch as the pleadings resulted in demurrer, and the replication did not controvert the allegations of the answer, it must be assumed that the facts stated in the answer are correct.

Looking at the statement of the case, it is quite obvious that two questions are presented for decision of very considerable importance to the parties; but in our examination of them we shall reverse the order in which they were discussed at the bar. Briefly stated, the questions are as follows:

First. Whether the defendants acquired any right, title, or interest in the lands in controversy, by virtue of the provisions of their charter, as originally granted by the Territorial Legislature; and if not, then,

Secondly. Whether the Territory, as a municipal corporation, by the true construction of the act of Congress set up in the answer, acquired, under it, any beneficial interest in the same, as contradistinguished from a mere naked trust or power to dispose of the land, in the manner and for the use and purpose described in the act?

Argument is not necessary to show that those questions arise in the case, because, if the defendants acquired such a right, title, or interest in the lands, under their original charter, then it is clear that it became a vested interest as soon as the act of Congress went into effect; and on that state of the case it would be true, as contended by the defendants, that the repealing act set up in the replication of the plaintiff is void, and of no effect. *Terret* vs. *Taylor*, (9 Cran., 43;) *Pawlet* vs. *Clark*, (9 Cran., 292.)

But the determination of that question in the negative does not necessarily show that the plaintiff is entitled to prevail in

the suit, because, if the legal effect of the act of Congress set up in the answer was to grant to the Territory a beneficial interest in the lands, then it is equally clear that it was not competent for Congress to pass the repealing act, and divest the title; and the defendants, on the facts exhibited in the plead-ings, although they did not acquire any title under their original charter, are, nevertheless, the rightful owners of the land, by virtue of the first amendment to the same, passed by the Territorial Legislature. Unless both of the questions, there-fore, are determined in the negative, the judgment of the court below must be affirmed. *Fletcher* vs. *Peck*, (6 Cran., 135.)

It is insisted by the defendants that their original charter, or that part of it already recited, operated as a valid grant to them of all the lands thereafter to be granted by Congress to the Territory, and that the charter took effect as a grant, so as to vest the title in the company the moment the act of Congress was passed. But it is very clear that the proposition can-not be sustained, for the reason that both principle and author-ity forbid it. Grants made by a Legislature are not warranties; and the rule universally applied in determining their effect is, that if the thing granted was not in the grantor at the time of the grant, no estate passes to the grantee. Even the defend-ants admit that such was the rule at common law; but they contend that the rule is not applicable to this case. Several reasons are assigned for the distinction; but when rightly con-sidered, they have no better foundation than the distinction itself, which obviously is without merit.

One of the reasons assigned is, that there is no common law of the United States, and, consequently, that the rule just men-tioned is inapplicable to cases of this description. Jurisdic-tion, in common law cases, can never be exercised in the Fed-eral courts, unless conferred by an act of Congress, because such courts are courts of special jurisdiction, and derive all their powers from the Constitution, and the laws of Congress passed in pursuance thereof. Rules of decision, also, in cases within the thirty-fourth section of the judiciary act, are derived from the laws of the States; but in the construction of the laws of Congress, the rules of the common law furnish the

true guide; and the same remark applies in the construction of the statutes of a State, except in cases where the courts of the State have otherwise determined.

Able counsel submitted the same proposition in the case of *Charles River Bridge* vs. *The Warren Bridge*, (11 Pet., 545;) but this court refused to adopt it, and, in effect, declared that the rules for the construction of statutes in the Federal courts, both in civil and criminal cases, were borrowed from the common law. See, also, 1 Story, Com. on Con., (3d ed.,) sec. 158.

More direct adjudications, however, as to the validity of a grant where the title was not in the grantor at the time it was made, are to be found in the earlier decisions of this court. Three times, at least, the question has been expressly ruled, and in every instance in the same way. It was first presented in the case of *Polk's Lessee* vs. *Wendell*, (9 Cran., 99,) and the court, Marshall, Ch. J., delivering the opinion, said that where the State has no title to the thing granted, or where the officer issuing it had no authority, the grant is absolutely void. Five years afterwards, the same case was again brought before the court, and the same doctrine was affirmed in the same words. *Polk's Lessee* vs. *Wendell*, (5 Whea., 303.)

Notwithstanding those decisions, the question was presented to the court for the third time in the case of *Patterson* vs. *Winn*, (11 Whea., 388;) and on that occasion this court, after referring to the previous decisions, said, we may therefore assume as the settled doctrine of the court, that if a patent is absolutely void upon its face, or the issuing thereof was without authority or prohibited by statute, *or the State had no title*, it may be impeached collaterally in a court of law in an action of ejectment. Assuming the rule to be a sound one, it is as applicable to a grant by a Territory as to one made by a State, and the cases cited are decisive of the point. Our conclusion, therefore, on this branch of the case is, that the defendants acquired no right, title, or interest in the lands in controversy by virtue of their original charter.

2. Having disposed of the first question, we will proceed to the consideration of the second, which involves the inquiry

whether any beneficial interest in the lands passed to the Territory under the act of Congress set up in the answer. It is contended by the defendants, on this branch of the case, that the act of Congress in question was and is, *per se*, a grant *in presenti* to the Territory of all the lands therein described, and that a present right estate and interest in the same passed to the Territory by the terms of the act. Reliance for the support of that proposition is chiefly placed upon the language of the first section. Omitting all such parts of it as are unimportant in this investigation, it provides "that there shall be, and is hereby, granted to the Territory of Minnesota, for the purpose of aiding in the construction of a railroad, * * * every alternate section of land, designated by odd numbers, for six sections in width on each side of said road within said Territory, * * * which land shall be held by the Territory of Minnesota for the use and purpose aforesaid." Certain words in the clause are omitted, because they are not material to the present inquiry, and if produced, would only serve to embarrass the investigation. Standing alone, the clause furnishes strong evidence to refute the proposition of the defendants, that a beneficial interest passed *in presenti* to the Territory; because it is distinctly provided that the lands granted shall be held by the Territory for a declared use and purpose, evidently referring to the contemplated railroad, which, when constructed, would be a public improvement of general interest. Resort to construction, however, on this point is wholly unnecessary, because it is expressly declared in the second proviso that the land hereby granted shall be exclusively applied in the construction of that road for which it was granted, and shall be disposed of only as the work progresses; and the same shall be applied to no other purpose whatever. Beyond question, therefore, the lands were to be held by the Territory only for the use and purpose of constructing the railroad described in the act, and they were to be applied to that purpose and no other.

Passing over the residue of the section, and also the second section, as unimportant in this inquiry, we come to the third, which shows, even more decisively than the first, that the interpretation assumed by the defendants cannot be sustained.

Among other things, it provides, "that the said lands hereby granted *shall be subject* to the disposal of any Legislature thereof for the purpose aforesaid, and *no other;* nor shall they inure to the benefit of any company heretofore constituted and *organized.*" Such disposal of the lands could not be made under the previous legislation of the Territory, for the reasons already assigned in answer to the first proposition of the defendants; and we may now add another, which is, that no such authority was conferred in the act of Congress granting the land. Whether we look at the language employed, or the purpose to be accomplished, or both combined, the conclusion is irresistible that it was by future action *only* that the Legislature was authorized to dispose of the lands, even for the purpose therein described; and it is clear, irrespective of the prohibitions hereafter to be mentioned, that they could not be disposed of at all for any other purpose, nor in such manner that they would inure to the benefit of any company previously constituted and organized. Much reason exists to conclude that the latter prohibition, notwithstanding the fact that the defendants were not then organized, includes their company; but, in the view we have taken of the case, it is not necessary to decide that question at the present time. Considered together, and irrespective of what follows, the first and third sections show that the lands were to be held by the Territory for the declared use and purpose of constructing a specified public improvement; that they could not be disposed of at all under any previous Territorial legislation, nor for any other purpose than the one therein declared, nor to any company falling within the prohibition set forth in the third section; but, restricted as the authorities of the Territory were by those limitations and prohibitions, their hands were still more closely tied by the provisions of the fourth section, which remain to be considered.

By the fourth section it is provided, "that the lands hereby granted to the said Territory shall be disposed of by said Territory only in the manner following—that is to say, no title shall vest in the said Territory of Minnesota, nor shall any patent issue for any part of the lands hereinbefore mentioned,

until a continuous length of twenty miles of said road shall be completed through the lands hereby granted." Provision is also made for the issuing of a patent for a corresponding quantity of the lands when the Secretary of the Interior should be satisfied that twenty miles are completed, and so on till the whole was finished; and it also provides that, if the road is not completed in ten years, no further sale shall be made, and the lands unsold shall revert to the United States. Comparing the several provisions together, it is not perceived that they are in any respect inconsistent, and certainly they all tend more or less strongly to the same conclusion. Certain lands are granted to the Territory by the first section, to be held by it for a specified use and purpose, to wit, for the construction of a specified public improvement, and to be exclusively applied to that purpose, without any other restriction, except that the lands could be disposed of only as the work progressed. To carry out that purpose, the lands were declared by the third section to be subject to the future disposal of the Territorial Legislature, but that, in no event should they inure to the benefit of any company previously constituted and organized. Neither of those sections contain any words which necessarily and absolutely vest in the Territory any beneficial interest in the thing granted. Undoubtedly, the words employed are sufficient to have that effect; and if not limited or restricted by the context or other parts of the act, they would properly receive that construction; but the word grant is not a technical word like the word enfeoff, and although, if used broadly, without limitation or restriction, it would carry an estate or interest in the thing granted, still it may be used in a more restricted sense, and be so limited that the grantee will take but a mere naked trust or power to dispose of the thing granted, and to apply the proceeds arising out of it to the use and benefit of the grantor. Whenever the words of a statute are ambiguous, or the meaning doubtful, the established rule of construction is, that the intention must be deduced from the whole statute, and every part of it. (1 Kent's Com., 462.) Intention in such cases must govern when it can be discovered; but in the search for it the whole statute must be regarded, and, if practicable, so expounded as to give

effect to every part. That rule cannot be applied to this case, if it be admitted that a beneficial interest in the lands passed to the Territory, because it is expressly provided by the fourth section of the act that no title shall vest in the Territory of Minnesota, nor shall any patent issue for any part of the lands, until a continuous length of twenty miles of the road shall be completed. Unless that whole provision, therefore, be rejected as without meaning, or as repugnant to the residue of the act, it is not possible, we think, to hold that the Territory acquired a vested interest in the lands at the date of the act; and yet the fourth section contains the same words of grant as are to be found in the first and third, and no reason is perceived for holding that they are not used in the same sense. It is insisted by the defendants that the provision does not devest the grant of a present interest; that it only so qualifies the power of disposal that the Territory cannot place the title beyond the operation of the condition specified in the grant. But they do not attempt to meet the difficulty, that, by the express words of the act, the absolute title remained in the grantor, at least until twenty miles of the road were completed; nor do they even suggest by what process of reasoning the four words, "no title shall vest," can be shorn of their usual and ordinary signification, except to say that it would be doing great injustice to Congress to hold, notwithstanding the words of the first section, that no title passed to the grantee. Whether the provision be just or unjust, the words mentioned are a part of the act, and it is not competent for this court to reject or disregard a material part of an act of Congress, unless it be so clearly repugnant to the residue of the act that the whole cannot stand together. On the other hand, if it be assumed that the Territory acquired but a mere naked trust or power to dispose of the lands and carry out the contemplated public improvements therein described, then the whole act is consistent and harmonious. *Sims* vs. *Lively*, (14 B. Mon., 432.)

These considerations tend so strongly to support the latter theory, that, even admitting the rule of construction assumed by the defendants that the grant must be construed most strongly against the grantor, we would still be constrained to

hold that the second proposition submitted by them cannot be sustained. Legislative grants undoubtedly must be interpreted, if practicable, so as to affect the intention of the grantor; but if the words are ambiguous, the true rule of construction is the reverse of that assumed by the defendants, as is well settled by repeated decisions of this court. *Charles River Bridge* vs. *Warren Bridge*, (11 Pet., 544.)

Most of the cases bearing upon the point previously decided were very carefully reviewed on that occasion, and, consequently, it is not necessary to refer to them. Judge Story dissented from the views of the majority of the judges, but the opinion of the court has since that time been constantly followed. Later decisions of this court regard the rule as settled, that public grants are to be construed strictly, and that nothing passes by implication. That rule was applied in the case of *Mills et al.* vs. *St. Clair County*, (8 How., 581;) and the court say the rule is, that if the meaning of the words be doubtful in a grant, designed to be a general benefit to the public, they shall be taken most strongly against the grantee and for the Government, and therefore should not be extended by implication in favor of the grantee beyond the natural and obvious meaning of the words employed; and if those do not support the right claimed, it must fall. Any ambiguity in the terms of the contract, say the court in the case of the *Richmond R. R.* vs. *The Louisa. R. R. Co.*, (13 How., 81,) must operate against the corporation, and in favor of the public, and the corporation can claim nothing but what is given by the act. *Perrine* vs. *Chesapeake Canal Co.*, (9 How., 192.) Taken together, these several cases may be regarded as establishing the general doctrine, that, whenever privileges are granted to a corporation, and the grant comes under revision in the courts, such privileges are to be strictly construed against the corporation, and in favor of the public, and that nothing passes but what is granted in clear and explicit terms. *Ohio Life and Trust Co.* vs. *Debolt*, (16 How., 435;) *Com.* vs. *The Erie and N. E. Railroad Co.*, (27 Penn., 339;) *Stourbridge* vs. *Wheeley*, (2 Barn. & Ad., 792;) *Parker* vs. *Great W. Railway Co.*, (7 M. & Gr., 253.)

*Rice* vs. *Railroad Company.*

That rule is plainly applicable to this case; and when applied, we think it is clear that the Territory acquired nothing under the act of Congress set up in the answer but a mere naked trust or power to dispose of the lands in the manner therein specified, and to apply the same to the use and purpose therein described. Suppose it to be so, then it is not controverted that Congress could at any time repeal the act creating the trust, if not executed, and withdraw the power. It is suggested, however, that the closing paragraph of the fourth section of the act is inconsistent with this view of the case, but we think not. Until the trust or power conferred was revoked by a repeal of the act, the lands were to be held by the Territory for the use and purpose therein described, and, of course, were to be withdrawn from sale and entry under the pre-emption laws of the United States; and unless some period was fixed for the completion of the contemplated improvement, the delay might become the subject of complaint and embarrassment. Ten years were accordingly allowed for that purpose, and if the work was not completed within that time, then the power of the Territory to dispose of the lands was to cease, without any further action on the part of Congress. Such part of the lands as had been appropriated at the expiration of that period in execution of the work, were to be unaffected by that provision, but the residue would cease to be held by the Territory for the use and purpose for which the lands had been granted, and would again fall within the operation of the pre-emption laws. Another suggestion is, that if the views of the plaintiff be adopted by the court, the same rule will apply to all the grants made by Congress to the States and other Territories. Of course the suggestion is correct, if such other grants are made in the same terms, and are subject to the same limitations, restrictions, and prohibitions; but we have looked into that subject, and think it proper to say, that we see no foundation whatever for the suggestion. One of those grants came under the revision of the court in the case of *Lessieur et al.* vs. *Price*, (12 How., 76,) and this court held, and we have no doubt correctly, that it was a present grant, and that the Legislature was vested with full power

to select and locate the land; but the case is so unlike the present, that we do not think it necessary to waste words in pointing out the distinction. Our conclusion upon the whole case is, that the act of Congress set up in the replication of the plaintiff is a valid law, and that the plaintiff is entitled to prevail in the suit.

Mr. Justice NELSON. I cannot agree to the judgment of the court in this case. The fundamental error of the opinion, I think, consists in not distinguishing between public and private legislative grants. The former concern government—are grants of political power, or of rights of property, connected with the exercise of political power for public purposes, in which no individual or corporate body can set up a vested interest, any more than a public functionary can set up a vested or private interest in his office. These are grants that may be altered, modified, or repealed, at the will of the Legislature. Examples of this description of grants are the erection of towns and the incorporation of cities and villages, to which are delegated a portion of the political power of the Government, to be administered within their limits and jurisdiction. Private legislative grants are subject to very different considerations. These are grants of rights of property, lands, or franchises, which may be made to individuals or corporate bodies, to towns, counties, States, or Territories, and in which the grantee may have private beneficial interests. Examples are, the grant of lands to a town for the founding of a school, or of a church, or for the benefit of the poor of the town. The grantee in all such cases takes a beneficial interest in the grant, as the representative of the persons for whose benefit it is made. The town has an interest in the encouragement and support of schools, in the education of the people under its charge, in the support and maintenance of religion and religious institutions, and in the maintenance of the poor. It is well settled in this court that grants of this description, when made by the Legislature of a State, cannot be recalled; and we do not perceive any reason why the inviolability of the same class of grants should be less when made by the legislative power of

the General Government. Congress has made many grants of lands to States and Territories for the same or kindred objects; for the founding of seminaries of learning; for building common roads, railroads, and canals; for reclaiming marsh lands, clearing obstructions from rivers, and other like objects. Now, can it be said that the States and Territories have no beneficial interest in these grants, or that they hold them as the mere agents of the General Government, or as naked trustees, and that they may be recalled at pleasure? I think not; certainly this is not the language of the court in respect to similar grants made by the States to public corporate bodies such as town and cities. If this be the sound construction of this class of grants, and the one to be hereafter adopted and applied, I do not see that any effect is to be given to them until the lands granted have been sold and conveyed to purchasers. They might take a valid title under the power of sale contained in the grant. But even then, the State or Territory would derive no benefit from the grant after the sale; for, if they hold the lands as public agents or naked trustees for the General Government, as has been argued, the purchase money would belong to it and might be reclaimed. Certainly, if the States and Territories are the mere agents of the General Government in the grants mentioned, the money would belong to the principal. Indeed, upon the doctrine contended for, I do not see how the sixteenth section in every township of the public lands which is reserved to it for common schools can be held by an indefeasible title. The use for which the grant is made in that instance is as much a public one as a grant of land to the town to build a canal, a turnpike, or railroad. And if a public use of this description deprives the town of any beneficial interest in the grant, then Congress may reclaim this sixteenth section if unsold, and, if sold, the purchase money.

It has been strongly insisted, that the grant in question rests upon different principles from one in which the title to the lands has vested directly in the State or Territory upon the passage of the law. The 3d section provides that the lands hereby granted, &c., shall be subject to the disposal of the Legislature of the Territory for the purpose mentioned. The

4th section: The lands hereby granted, &c., shall be disposed of by the Territory in the following manner: No title shall vest in said Territory, nor shall any patent issue for any part of the land, until a continuous length of twenty miles of said road shall be completed; and when the Secretary of the Interior shall be satisfied that any twenty miles has been made, a patent shall issue for a quantity of land not exceeding one hundred and twenty sections, and so on, until the road is finished. And then ten years is given for the completion of the road.

This is a conditional grant, the condition particularly specified in this fourth section. The condition is, the construction of twenty miles of the road, when one hundred and twenty sections are to be conveyed, and so on. The idea seems to be, that a conditional grant of this description may be revoked, but not one absolute in its terms. I am not aware of any such distinction. Certainly none is to be found in the common law. At common law or in equity a conditional grant is just as obligatory and indefeasible between the parties as one that is absolute. The grant carries with it not only the right, but the obligation, of the grantee to fulfil the condition; and until the failure to fulfil, the obligation is complete and the grant irrevocable.

It would be singular if the grantor, by availing himself of his own wrong in not waiting for the performance of the condition, could defeat the grant. Certainly it cannot be maintained, that the grant of land on condition is no grant until the condition is performed. And, if so, then why not as effectual and binding as an absolute grant, until default in the condition?

But there is another equally satisfactory answer to this ground for revoking the grant. The provision relied on, instead of furnishing evidence of an intent not to make a binding grant to the Territory, leads to a contrary conclusion. Its object cannot be mistaken. It was to secure the application of the lands or the proceeds of them to the construction of the road. The act had before declared that the lands granted should be disposed of by the Territory only as the work progressed, and in

furtherance of this purpose, and to prevent any failure of it, provided that no title should vest or patent issue except from time to time as twenty miles of the road were completed. The argument that this provision indicates an intention on the part of Congress not to vest any beneficial interest in the Territory in the lands seems to me to be founded on a misapprehension of its purport and effect, which was simply to secure the accomplishment of the purposes of the grant.

Then, as to the difference between this grant and the numerous others of a similar description, which it is said are subject to a different interpretation. I have examined several of them. The present one is a copy of the others *mutatis mutandis*, with one exception, and that is, instead of withholding the title to the lands till the twenty miles of the road are completed, the act forbids the sale of them till the condition is fulfilled. In the one instance, on satisfying the Secretary of the Interior that the twenty miles have been constructed, the patent issues for the several sections specified; in the other, on satisfying him that the work has been done, he gives to the State or Territory an authority to sell. The different provisions prescribe a different mode of securing the application of the lands to the purposes of the grant. This is the object and only object of each of them; and so far as this distinction goes, other grants of this description will be entitled to the benefit of it in case of an attempt to revoke them.

Mr. Justice WAYNE concurred in the dissent expressed by Mr. Justice *Nelson,* and added, as a further reason against the judgment of the court, that after this grant was made, more than a million of dollars was subscribed upon the faith of it to the railroad corporation.

Mr. Chief Justice TANEY, Mr. Justice GRIER, and Mr. Justice SWAYNE concurred in the opinion of Mr. Justice *Clifford.*

Mr. Justice CATRON did not sit in the case, being prevented by illness.

*Judgment of the District Court reversed, and the cause remanded with directions to overrule the demurrer filed by the defendants, issue a writ of inquiry to ascertain the plaintiff's damages, and after the return of the inquisition to enter judgment in his favor.*