# LEVI H. WHITNEY

*vs.*

# JOHN B. FRISBIE.*

1. The act of Congress of March 24th, 1862, limited the claims of the purchasers under the Vallejo title to such portions of the Soscol Ranch as had been reduced to possession and settlement, in the usual acceptation of those terms, *provided that* no single improvement and settlement embraced more than one quarter-section of the tract in all cases where such claim interfered with existing established rights of pre-emption.

2. The Soscol Ranch was open to actual settlement and pre-emption in October, 1862, under the pre-emption act of 1841, and a settler having made an actual settlement and complied with all the terms and conditions required by law to complete his title, or tendered performance thereof, is entitled to a patent; he has obtained such an interest and vested title and property therein as cannot be taken from him and transferred to another against his consent even by an act of Congress.

3. Nor does the act of Congress of March 3d, 1863, interfere with such right, but rather protects the title of such a settler.

4. Where one has wrongfully obtained from the government a patent for land to which a settler is already entitled under the pre-emption laws, he holds such title as a trustee for such settler and will be required to convey it to the equitable owner.

5. Questions of trust are personal and not local, and are therefore subject to the jurisdiction of this Court, though the land in respect of which the trust has arisen is situated elsewhere.

6. On an appeal to the Supreme Court of the United States any of the justices of this Court may on application to them fix the penalty of the appeal bond and determine as to the sufficiency of the sureties, and neither the statute or the rules of the Supreme Court provide for a re-hearing or a re-adjudication of the same matter, before any other justice of this Court.

7. After a final decree in this Court and appeal taken according to the statute and the practice of the Court, this Court loses all further jurisdiction of the cause and the parties and can make no further order therein.

8. Where the appeal bond is inadequate or the sureties are insufficient the remedy would seem to be an application to the Supreme Court to dismiss the appeal on either or both of those grounds.

Equity No. 734.   Decided May 27th, 1868.

*Reversed in part by the Supreme Court of the United States. See Frisbie *vs.* Whitney, 9 Wall., 187.

BILL to compel conveyance of certain lands in California. Certified to the General Term for hearing in the first instance.

THE FACTS are stated in the opinion.

MESSRS. BRADLEY & BRADLEY and MONTGOMERY BLAIR, for complainant.

MESSRS. DUNCAN S. WALKER and FRED. P. STANTON, for defendants.

MR. JUSTICE WYLIE delivered the opinion of the Court:

The quarter section of land in controversy is part of a large Mexican grant in California known as The Soscol Ranch.

Frisbie, the defendant, has obtained a patent from the United States for this quarter section; and the object of this suit is to compel him to convey his legal title to the complainant, on the ground that the latter had a prior valid equitable claim under the pre-emption act of 4th September, 1841.

In 1844, Micheltorena, Mexican Governor of California, assumed to make a grant of about 90,000 acres of land comprising the Soscal Ranch to one Col. Vallejo, for the sum of $5,000 in money.

In 1855 Vallejo conveyed a large part of this tract, including the quarter section now in controversy to his son-in-law, the present defendant.

On the 24th March, 1862, the Vallejo title to all this tract of land was declared to be void by the Supreme Court of the United States.

On the 2d of June, 1862, Congress passed an act, declaring and making all lands belonging to the United States to which the Indian title has been or shall be extinguished, whether surveyed or not surveyed subject to settlement and pre-emption under the act of September, 1841.

The title of Vallejo to the Soscol Ranch being void, the

land belonged to the United States, and although not yet surveyed was by this act of June 2, 1862, ch. 94, opened to actual settlement and pre-emption.

In October, 1862, the complainant entered upon the quarter section in controversy in this cause, made an actual settlement and improvement, cultivated the land, has remained in possession to this day ; and has complied or tendered himself ready to comply with all the other terms and conditions required by law to entitle him to a patent for the land.

Evidence was taken on this question before the register and receiver of the land office in California, who reported it to be sufficient to establish complainant's right, but they decided against him on the ground that in their opinion the land was not subject to pre-emption.

This decision, however, was reversed by the Commissioner of the Land Office, who held that the land was subject to actual settlement and pre-emption under the act of 1841.

From this decision of the Commissioner, defendant appealed to the Secretary of the Interior, who referred the question to the Attorney General, Mr. Speed, for his opinion on the subject.

The Attorney General thereupon furnished the Secretary with an opinion in accordance with which the latter reversed the decision of the Commissioner, and rejected the claims of all the settlers on the Soscol Ranch.

The following extract from that opinion contains the law on the subject as laid down by the Attorney General:

"That a settlor under the pre-emption laws acquires and can acquire no vested interest in the land he occupies by virtue simply of settlement; and that no vested interest is obtained until the settlor has taken *all* the legal steps necessary to perfect an entrance in the Land Office. Before such steps are taken, he has nothing but a contingent, personal privilege to become, without competition, the first

purchaser of the property which he may never exercise or which he may waive or abandon. During the interval between the institution of the settlement, and the establishment of the claim by proof and payment of the consideration nominated in the law, Congress has power to dispose of the land at its pleasure. It may recall the privilege previously conferred or invest any one else with the same privilege or it may make an absolute grant of the land to other parties with or without consideration."

The claims of settlers on the public lands even after having laid out their money, and expended their labor in making improvements and cultivation, no matter to what amount, or extent, and under the clear and solemn pledge of the Government, that they should thereby secure the absolute right of pre-emption being thus held, by the learned Attorney-General as of "no account," the Secretary of the Interior refused to recognize the claim of this complainant, as well as those of all the other settlers on this ranch, and directed patents to be issued to the claimants under the void title of Vallejo, in obedience as he supposed to the act of Congress about to be referred to.

At the instance of these Vallejo claimants Congress passed the act of 3d March, 1863, which the Attorney-General thought gave them a right superior to that of the actual settlers and improvers on the land, and it was under this act, and this construction of it, that patents have been issued in the claims of actual settlers, conceded to be as perfect as it is ever possible for such claims to be.

This act provides first for a survey to be made of the Soscol Ranch as a portion of the public lands.

Second, that after the plats of survey had been returned to the District Land Office, "it shall, and may be lawful for individuals, *bona fide* purchasers from said Vallejo or his assigns to enter according to the lines of the public surveys at $1.25 per acre, the land so purchased, to the extent to

*34*

which the same had been reduced to possession at the time of said adjudication of said Supreme Court."

Section fourth provides that all claims within the purview of the act should be presented to the register and receiver within twelve months after the return of the surveys, accompanied by proof of *bona fide* purchase under Vallejo, of settlement, and the extent to which the lands claimed had been reduced to possession at the time of the adjudication of the Supreme Court, and said register and receiver were to decide upon said claims, under such instructions as should be given them by the Commissioner of the Land Office, to whom the proof and adjudication were to be returned to the Local Land Office, and no adjudication should be final until confirmed by the Commissioner.

The second section of this act limits the privilege of purchase granted to the Vallejo claimants, to such parts of the ranch as they had "*reduced to possession at the time of the adjudication of said Supreme Court.*"

The fourth section, also, required proof to be made of "*bona fide* purchase under Vallejo, *of settlement, and the extent to which the lands claimed had been reduced to possession at the time of the adjudication of the Supreme Court.*"

On proof of *bona fide* purchase under Vallejo, these claimants were entitled to obtain patents on paying $1.25 an acre for their land, to the extent that such lands had been reduced to possession at the time of the adjudication of the Supreme Court, namely 24th March, 1862, and they were entitled to no more. The fifth section provides, that all other portions of the ranch not embraced by these *bona fide* claims and settlement, should be "dealt with as other public lands."

The act in every section thereof treats the Vallejo title as void and the whole tract as public lands belonging to the government and intends to grant to the Vallejo claimants merely the "bounty" of pre-emption to the extent that

each of them had reduced his claim to possession at the date of the decision of the Supreme Court.

. But the land in controversy in this case at the time of the decision of the Supreme Court referred to, had not been reduced to possession and settlement by this defendant nor by any one, in the usual sense of those terms when found in other acts of Congress relating to the public lands. It had neither been inclosed, cultivated, nor improved, otherwise than as it adjoined other portions of the ranch which had been so reduced to possession and settlement. We are of opinion that the fair construction of this act limited the claims of the purchasers under Vallejo, to such portions of the Soscol Ranch as had been reduced to possession and settlement, in the usual acceptation of those terms, and that no single improvement and settlement should embrace more than one quarter-section of the tract in all cases where such claim interfered with existing established rights of pre-emption. We think this is plainly the proper construction to be given to the second section of the act, which is in the following words: "That after the return of such approved plats to the District office, it may and shall be lawful for individuals, *bona fide* purchasers from said Vallejo, or his assigns, to enter, *according to the lines of the public surveys,* at one dollar and twenty-five cents per acre, the land so purchased *to the extent to which the same had been reduced to possession* at the time of said adjudication of said Supreme Court, joint entries being admissible by coterminous proprietors to such an extent as will enable them to adjust their respective boundaries."

The entries were to be made according to the lines of the public surveys, "*to the extent to which the same had been reduced to possession.*" The benefit of any one settlement and possession under this act, was to be restricted to the lines of the public surveys. One acre so settled and possessed would entitle the purchaser to some portion of the land, limited by the public surveys. What portion shall that be? It might

embrace many thousands of acres had the grant not been restricted by the condition that it should be confined to such portion as had been actually reduced to possession.

The defendant in this case thinks that the reduction of even a fraction of an acre on one corner of his void claim of thousands of acres entitles him to a pre-emption of the whole, in preference to the *bona fide*, vested, pre-emption rights obtained by actual settlers prior to the date of the act on which he builds his title, and at a time when the Vallejo claimants had no· color of title, and not even an actual settlement. If the construction claimed by the defendant be correct (and it is the one on which the Department has acted in issuing his patent in this case), then it follows that any purchaser under Vallejo might claim sixty, eighty, or even ninety thousand acres of the land by showing the settlement and possession of a fraction of one acre on any portion of this vast territory.

We think the fair construction of the act in question is that which limits the claims of the Vallejo purchasers to such portions of the ranch as Congress, at the date of the act, had the right to grant consistently with the obligations of contract and good faith, which were due from it to the settlers.

Since the passage of the Act of 4th September, 1841, which introduced a new policy in regard to the public lands, the settler who goes upon a quarter section and makes his settlement and improvement acquires thereby an inchoate equitable title, which is as complete and perfect, to its extent, as title to any property can be.

Formerly settlers on the public lands were trespassers, but from time to time acts of Congress were passed allowing them the right of pre-emption on certain terms. To them these acts conferred bounty privilege, because the settlers having entered on the lands in violation of law, had no rights against the Government. And when we meet with an opinion of the Supreme Court which speaks of the rights

of the settlers to pre-emption, as a bounty, or gratuity on the part of the Government, we shall always find, that the Court is referring to cases under the acts in force prior to the passage of the act of 1841.

In the United States vs. Fitzgerald, 15 Peters, 407, it was held that no reservation or appropriation of the public lands can be made after a citizen has acquired the right of pre-emption.

In Lytle vs. The State of Arkansas, 9 Howard, 333, the Court say: "The claim of pre-emption is not that shadowy right which by some it is considered to be. Until sanctioned by law, it has no existence as a substantive right; but when covered by the law it becomes a legal right, subject to be defeated only by a failure to perform the conditions annexed to it."

In Delassus vs. The United States, 9 Peters, 133, Chief Justice Marshal says that " no principle is better settled in this country than that an inchoate title to lands is property," and again he says: " The inquiry then is whether this concession was legally made by the proper authorities, and might have been perfected into a complete title." His inference was that the inchoate right which might have been perfected into a complete title, was "property."

In Smith vs. the United States, 10 Peters, 330, Mr. Justice Baldwin, in delivering the opinion of the Court, says: " It was never doubted by this Court that property of every description in Louisiana was protected by the law of nations, the terms of the treaty, and the act of Congress, and that in the term " property was comprehended every species of title, inchoate, or perfect, embracing those rights which lie in contract, those which are executory, as well as those which are executed." See also Rice vs. Railroad Company, 1 Black, 358.

The act of 1841 invites settlers to enter upon and make improvements on the public lands, and pledges the faith of the Government, that they shall have a patent for their

lands, for $1.25 an acre. A settler makes his selection, moves his wife and children perhaps a thousand miles and settles on a quarter section of the public land, builds his cabin, and stable, clears away the forest, and at length, after years of united toil, hardship and exposures, on his part and that of his family, and the expenditure of hundreds of dollars in actual money in reliance on the promise of the Government embodied in a solemn act of Congress, that he should have his patent on paying $1.25 an acre for the land, he is told by an Attorney-General of the United States, and a Secretary of the Interior, that he has no interest or title to his land—that " Congress has power to dispose of the land at its pleasure. It may recall the privilege previously conferred, or invest any one else with the same privilege, or it may make an absolute grant to other parties with or without consideration.

Such views as these are abhorrent not only to our sense of justice, but to every principle of law.

We are of opinion that at the date of complainant's entry on the land in controversy in October, 1862, it was open to actual settlement and pre-emption. That complainant having made his actual settlement and improvement on land, and complied with all the terms and conditions required by law to complete his title or tendered performance thereof, was entitled to have a patent for the land, and obtained such an interest and vested title and property therein, as could not be taken from him and transferred to another against his consent, even by an act of Congress.

That the act of Congress of March 3, 1863, under which the defendant professes to derive his title must be construed *in pari materia,* and in a sense consistent with the preservation of rights already fully vested and beyond the power of Congress to destroy rather than in a sense not given to the same language in other acts of Congress on the like subjects or in a sense repugnant to established principles of justice and law; and that so read and interpreted the act

itself protects the title of the complainant and silences the pretences of the defendant.

And that the defendant having wrongfully obtained from the Government a patent for the land in controversy, holds the legal title as a trustee for the complainant, and must be required to convey it to the equitable owner.

As the subject of this controversy is a question of trust, and therefore personal and not local, the jurisdiction of this Court is undoubted.

Nor are the proceedings between these parties now pending in a court in California any just obstacle to our jurisdiction, as the subject and the objects of that controversy are wholly different from these involved in the present suit.

NOTE.—The defendant having appealed to the Supreme Court of the United States from the decree rendered in accordance with the foregoing opinion and an appeal bond having been given. The plaintiff procured in Chambers a rule upon the defendant to show cause why the said bond should not be set aside for insufficiency, &c. The further facts necessary to an understanding of the case appear in the opinion of Mr. Justice Olin delivered upon the hearing of the rule.

MR. JUSTICE OLIN said:

A bill in equity was filed in this case, the object of which was after various amendments to procure a decree of this Court adjudging that a patent for certain lands granted by the general government to Frisbie was held in trust for Whitney, and that Frisbie be decreed to transfer the legal title to such lands to Whitney, and by the judgment of this Court a decree was entered in favor of the complainant as prayed in the bill. From that decree an appeal was prayed to the Supreme Court of the United States, and a bond was tendered and approved by the Chief Justice of this Court within the time limited by law, which made the

appeal operate as a supersedeas of the execution, or enforcement of the decree.

On the presentation of affidavits an order was made that the defendant Frisbie show cause why the appeal bond filed in the case should not be set aside for insufficiency in amount as well as for the alleged inability of the sureties named in the bond to respond to the amount of its penalty, viz., $6,000.

Affidavits are produced tending to show that the bond is insufficient in amount to cover the rents and profits of the real estate of which the complainant by the decree of this Court is the adjudged owner during the probable pendency of the appeal to the Supreme Court, and also showing that the sureties in the bond are wholly irresponsible.

The bond is in due form and was approved by the Chief Justice of this Court. It is, however, stated in Whitney's affidavit on this motion that no proof was submitted to the Chief Justice of the sufficiency of either of the sureties or notice given to the complainant Whitney or his counsel of the application to file the bond.

I am of the opinion that the motion in this case should be denied for the following reasons:

1st. Either of the Justices of this Court might on application to him fix the penalty of the appeal bond and determine as to the sufficiency of the sureties, and neither the statute or the rules of the Supreme Court provide for a re-hearing or a re-adjudication of the same matter before any other justice of this Court.

2d. That after a final decree in this Court and appeal taken according to the statute and the practice of the Court this Court lost all further jurisdiction of the cause and the parties and could make no further order in said cause.

3d. Whatever remedy the party may be entitled to in this matter, it would seem to be, on application to the Supreme Court to dismiss this appeal on the ground of this insufficiency of the sureties in the appeal bond or upon the ground of the inadequacy of the penalty of the bond. See Castlet vs. Brown, 9 Wheat., 553 Conklin's Treatise, Third Ed., 682.