[No. 529.    October 2, 1893 ]

ATLANTIC & PACIFIC RAILROAD COMPANY,
   PLAINTIFF IN ERROR, V. ROBERT MINGUS,
   DEFENDANT IN ERROR.

PUBLIC LANDS—GRANT TO RAILROAD—FORFEITURE—VALIDITY OF "FOR-
   FEITURE ACT" OF CONGRESS OF JULY 6, 1886—GRANT OF AUTHORITY
   TO MORTGAGE AFTER BREACH OF CONDITION—PATENT—EJECTMENT.—
   In an action of ejectment, by a railroad company, for the recovery of
   land, claimed by plaintiff under an act of congress of July 27, 1866,
   incorporating it, and granting it certain lands on certain conditions
   therein prescribed, for breach of which the United States reserved the
   right to do "all acts and things which may be needful and necessary
   to insure a speedy completion of the said road," and also under an
   act of congress of April 20, 1871, giving it the power to mortgage its
   property and franchises, and held by defendant under a claim of
   title derived through a patent from the United States of date of
   December 10, 1891, and under an act of congress of July 6, 1886,
   declaring a forfeiture of said land for failure of plaintiff to comply
   with the conditions imposed by the granting act of 1866; plaintiff
   claiming that the provisions of the mortgage act of 1871 showed it
   was not the intention of congress to reserve the power to forfeit in
   the act of 1866, that the mortgage act created a new contract, ex-
   tending the term within which it was to complete the construction of
   its road, and that, under its provisions, contracts had been made
   which were violated by the "Forfeiture Act" of 1886; and defendant
   contending that the act of 1886 was constitutional and legal, congress
   having expressly reserved the power to forfeit in section 9 of the act
   of 1866; that that power existed even if no such reservation was
   intended to be made; and that the purpose of the mortgage act was
   only to remove all doubt as to the right to mortgage, and thus to aid
   the company in obtaining funds to construct its road; that the mort-
   gagees took only such title as the company had, under the granting
   act, subject to the right of the United States to forfeit; and that

their rights and equities were not before the court for its considera‑
tion,—Held: Congress had the power to pass the act of July 6, 1886,
declaring a forfeiture of the unearned lands, for breach of the con‑
ditions imposed by the granting act of July 27, 1866.

2. It was not the intention of congress, by the mortgage act of 1871, to
extend the time within which the defendant company might complete
its road.   The purpose of that act was only to declare the right of
the company to mortgage its property, including the lands, and as an
assurance to capitalists, or those who might invest in its bonds, that
no advantage would be taken of the breach theretofore suffered.

ERROR, from a judgment in favor of defendant, to
the Fourth Judicial District Court, San Miguel County.
Judgment affirmed; LEE and SEEDS, JJ., dissenting.

The facts are stated in the opinion of the court.

FRANK SPRINGER for plaintiff in error.

LONG & FORT for defendant in error.

If there is a time specified within which conditions
must be performed, they can not be performed after‑
ward. Tied. Real. Prop., sec. 274.

In a grant like the one under consideration time is
of the essence of the contract. Southern Pac. R'y Co.
v. Esquibel, 5 N. M. (Gil.) 141.

The grant should be construed favorably to the
United States. Grant v. Leet, 96 Am. Dec. 403; Sli-
dell v. Granjean, 111 U. S. Rep. 437.

It is not necessary to reserve in the act power to
declare a forfeiture.   The right of forfeiture results
from a failure to perform the conditions subsequent,
and is also maintainable on the ground of public
policy.   Farnsworth et al. v. Min. & Pac. R'y Co., 92
U. S. 66.   See, also, 2 Wash. Real Prop., pp. 10, 13.

The case of Southern Pac. R'y Co. v. Esquibel, 5
N. M. 123, is conclusive in this court against the plain-
tiff.

FALL, J.—This is an action of ejectment, brought
by the plaintiff in error to recover possession of one

hundred and twenty acres of land situated in San Miguel county, New Mexico. The plaintiff claims title under act of congress of July 27, 1866, the provisions of which necessary to be considered in this cause are as follows: "Be it enacted," etc.: "Section 1. That John Brown  *  *  *  John C. Fremont  *  *  * and all such other persons who shall be associated with them and their successors, are hereby created and erected into a body corporate and politic in deed and in law, by the name, style, and title of the Atlantic & Pacific Railroad Company, and by that name shall have perpetual succession, and shall be able to sue, plead, and be impleaded, defend and be defended, in all courts of law and equity within the United States, and may make and have a company seal, and said corporation is hereby authorized and empowered to lay out, locate, construct, furnish, maintain, and enjoy a continuous railroad and telegraph line, with the appurtenances, namely: Beginning at or near the town of Springfield, in the state or Missouri; then to the western boundary of said state, and thence by the most eligible railroad route as shall be determined by said company, to a point on the Canadian river; thence to the town of Albuquerque, on the River del Norte, and thence by the way of the Agua Frio, or other suitable pass, to the head waters of the Colorado Chiquito, and thence along the thirty-fifth parallel of latitude, as near as may be found most suitable for a railway route, to the Colorado river at such point as may be selected by said company for crossing; thence by the most practicable and eligible route to the Pacific. The said company shall have the right to construct a branch from the point at which the road strikes the Canadian river, eastwardly, along the most suitable route as selected, to a point on the western boundary line of Askansas, at or near the town of Van Buren. And the said company is hereby vested with all the

powers, privileges, and immunities necessary to carry into effect the purposes of this act as herein set forth.   The capital stock of said company shall consist of one million shares of one hundred dollars each, which shall in all respects be deemed personal property, and shall be transferable in such manner as the laws of said corporation shall provide," etc.   (Various details relating to the organization of the company.) "Sec. 2. And be it further enacted: That the right of way through the public lands be, and the same is, hereby granted to the said the Atlantic & Pacific Railroad Company, its successors and assigns, for the construction of the railroad and telegraph line as proposed; and the right, power, and authority is hereby given to said corporation to take from the public lands adjacent to the line of said road, material of earth, stone, timber, etc., for the construction thereof.   Said way is granted to said railroad to the extent of one hundred feet in width on each side of said railroad where it may pass through the public domain, including all necessary grounds for station buildings, workshops, depots, machine shops, switches, side tracks, turntables, and water stations; and the right of way to be exempt from taxation within the territories of the United States. The United States shall extinguish as rapidly as may be consistent with public policy, and the welfare of the Indians, and only by their voluntary cession, the Indian title to all lands falling under the operation of this act and acquired in the donation to the road named in the act.   Sec. 3. And be it further enacted:   That there be, and hereby is, granted to the Atlantic & Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of said line and its branches, every alternate sec-

tion of public land, not mineral, designated by odd numbers to the amount of twenty alternate sections per mile on each side of said railroad line as said company may adopt through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad, whenever it passes through any state, and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preemption or other claims or rights, at the time the line of said road is designated by plat thereof, filed in the office of the commissioner of the general land office.   *  *  *  And provided further, that no money shall be drawn from the treasury of the United States to aid in the construction of the said Atlantic & Pacific Railroad.'' Section 4 provides the manner in which the railroad shall be examined by commissioners and accepted, and patents for lands issue as the road is constructed. Section 5 provides how the road shall be built. Section 6 provides for surveying of the land grant by order of the president, and withdraws from sale, entry, or preemption the said lands. ''Sec. 8. And be it further enacted: That each and every grant, right, and privilege herein, are so made and given to, and accepted by, said Atlantic and Pacific Railroad Company upon, and subject to, the following conditions, namely: That said company shall commence the work on said road within two years from the approval of this act by the president, and shall complete not less than fifty miles per year after the second year, and shall construct, equip, furnish, and complete the main line of the whole road by the fourth day of July, A. D. 1878. Sec. 9. And be it further enacted: That the United States make the several conditional grants herein, and that the said Atlantic & Pacific Railroad Company accept the same upon the further condition that if the said railroad make any breach in the conditions hereof, and allow

the same to continue for upwards of one year, then and in such case at any time hereafter, the United States may do any and all acts and things which may be needful and necessary to insure a speedy completion of the said road." "Sec. 11. And be it further enacted: That the said Atlantic & Pacific Railroad, or any part thereof, shall be a post route and military road, subject to the use of the United States for postal, military, naval, and all other government service, and also subject to such regulations as congress may impose restricting the charges for such government transportation." "Sec. 19. And be it further enacted: That unless the said Atlantic & Pacific Railroad Company shall obtain bona fide subscriptions to the stock of said company to the amount of one million dollars, with ten per centum paid, within two years after the passage of, and approval of, this act, it shall be null and void. Sec. 20. And be it further enacted: That the better to accomplish the object of this act, namely, to promote the public interest and welfare, by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times, but particularly in time of war, the use and benefits of the same for postal, military, and other purposes, congress may at any time, having due regard for the rights of the said Atlantic & Pacific Railroad Company, add to, alter, amend, or repeal this act." The defendant in error relied upon a United States patent issued December 10, 1891. There is no conflict of testimony as to the facts upon which the rights of the parties depend. The cause was tried by a jury, and a verdict of not guilty returned. Judgment accordingly entered, from which plaintiff sues out writ of error to this court. Errors assigned are: The rulings of the district court admitting in evidence defendant's patent, refusing to direct the jury to find for the

plaintiff, refusing the instructions requested by plaintiff, and directing the jury to find for the defendant.

There is no question here as to the proper organization of the company, including the subscription to the stock within the time fixed. The company surveyed and located its route, and filed its plats from time to time, and the alternate sections of land within the forty mile limit on each side of the located line were withdrawn by order of the president, in accordance with the provisions of section 6 of the act. By the eighth section of the act the company was required to commence construction within two years from the date of the approval of the same, and to build not less than fifty miles of railroad each year thereafter, and to complete the "whole road" by July 4, 1878. On April 20, 1871, up to which date the company had not complied with its contract in reference to the annual construction required, an act of congress was approved, which is as follows, viz.: "An act to enable the Atlantic & Pacific Railroad Company to mortgage its road. Be it enacted," etc.: "That the Atlantic & Pacific Railroad Company, organized under act of congress of July twenty-seventh, eighteen hundred and sixty-six, is hereby authorized to make and issue its bonds in such form and manner, for such sums, payable at such times, and bearing such rate of interest, and to dispose of them on such terms as its directors may deem advisable; and to secure said bonds, the said company may mortgage its road, equipment, lands, franchises, privileges, and other rights and property, subject to such terms, conditions, and limitations, as its directors may prescribe. As proof and notice of the legal execution and effectual delivery of any mortgage hereafter made by said company, it shall be filed and recorded in the office of the secretary of the interior: provided, that if the company shall hereafter suffer any breach of the conditions of the act above referred to, under which it is organized, the

rights of those claiming under any mortgage made by the company to the lands granted to it by said act shall extend only to so much thereof as shall be coterminous with, or appertain to, that part of the said road which shall have been constructed at the time of the foreclosure of said mortgage." After the passage of this act the company executed mortgages to secure bonds due at various times from 1901 to 1922, the greater number of those bonds being guarantied by the St. Louis & San Francisco, and Atchison, Topeka & Santa Fe Railroad Companies. The interest on the bonds has been paid, and no breach, apparently, made in the conditions of the mortgage, except failure to construct the road with due diligence. Up to July 4, 1878, the date fixed for the completion of the road by the act of 1866, the company had completed less than one hundred and twenty-five miles of road, all told; but prior to July 6, 1886, it completed five hundred and sixty miles from Albuquerque west, and about fifty miles, as claimed, in the Indian territory. The line from Sepulpa, about one hundred and twenty-five miles from the initial point, Springfield, to Albuquerque, and from Mojave, five hundred and sixty miles west of Albuquerque, remains to the present time uncompleted. On July 6, 1886, congress passed the following act, viz.: "Be it enacted by the senate and house of representatives of the United States of America, in congress assembled, that all the lands, excepting the right of way and the right, power, and authority given to said corporation to take from the public lands adjacent to the line of said road material of earth, stone, timber, and so forth, for the construction thereof, including all necessary grounds for station buildings, workshops, depots, machine shops, switches, side tracks, turntables, and water stations, heretofore granted to the Atlantic & Pacific Railroad Company, by an act entitled, 'An act granting lands to aid in the construction of a railroad and telegraph line

from the states of Missouri and Arkansas to the Pacific coast,' approved July twenty-seventh, eighteen hundred and sixty-six, and subsequent acts and joint resolutions. of congress, which are adjacent to, and coterminous with, the uncompleted portions of the main line of said road, embraced within both the granted and indemnity limits, as contemplated to be constructed under and by the provisions of the said act of July twenty-seventh, eighteen hundred and sixty-six, and acts and joint resolutions subsequent thereto and relating to the construction of said road and telegraph, be and the same are hereby declared forfeited and restored to the public domain. Approved July 6, 1886." After the passage of this act, all the lands which had been prior to that time set aside and withdrawn under the act of 1866 were restored to the public domain, except those opposite and coterminous with the road actually constructed. Among the lands so restored was the tract now in question.

The question upon which we now have to pass is solely that of the validity or constitutionality of the act of 1886, known as the "Forfeiture Act." If the act is invalid or unconstitutional, the plaintiff should recover, for the grant was undoubtedly a grant in praesenti; floating, it is true, but becoming fixed upon the performance by the grantee of the conditions prescribed, and, when so fixed, taking effect as of the date of the granting act. Schulenberg v. Harriman, 21 Wall. 44, 60; Leavenworth, etc., R'y Co. v. U. S., 92 U. S. 733, 741. The title of the grantee under such an act is superior to a United States patent issued for lands within the grant limits, acquired subsequent to the date of the act. Wright v. Roseberry, 121 U. S. 488, 7 Sup. Ct. Rep. 985; U. S. v. Southern Pac. R'y Co., 146 U. S. 593, 13 Sup. Ct. Rep. 163, and authorities supra. Defendant in error contends that the forfeiture act of

VALIDITY of "Forfeiture Act" of July 6, 1886.

1886 is constitutional and legal; that under section 9 of the act of 1866 power is expressly reserved to congress to forfeit, and that such power exists even if no such reservation was intended to be made; that the mortgage act of 1871 is only declarative of the right to mortgage, and its purpose was to remove all doubt of that right, and thus aid the company in obtaining funds with which to construct the road; that the mortgagees took only the title vested in the company by the terms of the granting act, subject to the right of the United States to forfeit, and that the rights or equities of the mortgagees are not now for the consideration of this court. Plaintiff admits that if no right to forfeit had been reserved, and no consequences of a breach declared in the granting act, the right to forfeit would exist; but contends that, with the consequences of the breach expressly declared, these alone can ensue from a breach and exclude the right to forfeit. Plaintiff also insists that the government failed to comply with its part of the contract, as expressed in the grant, in reference to Indian titles, and that this failure of the grantor is largely responsible for the delay of construction by the grantee, and that the forfeiture act should not have been passed. Plaintiff further contends that the provisions of the mortgage act of 1871 show clearly that it was not the intention of congress to reserve the power to forfeit in the act of 1866, and, further, that the mortgage act created a new contract, extending expressly the term within which the grantee was to complete construction, and that under its provisions contracts have been made which are violated by the forfeiture act of 1886.

This court in the case of Railroad Co. v. Esquibel, 5 N. M. 123, cited and relied on by counsel for the defendant in error, held that "time was of the essence of the contract," and in construing a clause

in the Texas Pacific act, similar to section 9 of the grant act of 1866, declared that the clause was for the benefit of the government, and not of the company. The purpose for which this grant was made is repeatedly declared in the different sections of the act; that is, "to aid in the construction of a road, to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores to the Pacific coast." Section 20 of the act provides that to "better accomplish" the objects thereof, namely, "to promote the public interest and welfare," etc., and to "secure to the government at all times * * * the use and benefit of the same [railroad and telegraph lines] for postal, military and other purposes, congress may at any time, having due regard to the rights of said Atlantic & Pacific Railroad Company, add to, alter, amend, or repeal this act." What stronger reservation could be desired? Are we to say, in the face of the provisions of sections 9 and 20, that the legislature and the courts are to have "due regard for the rights of the grantee," and no regard whatsoever for the rights of the United States or of the public, and shall not consider the public welfare, which is expressly declared to be the object for which this enormous grant was made? Are we to say that the congress of the United States intended to create a corporation, give it the breath of everlasting life, grant to it sovereign powers of eminent domain, endow it with a princely estate vaster than a kingdom of the old world, and set it above the laws, above the courts, above the people, above the government, making the "thing" greater than its creator? It is true that "a corporation created by the legislature, and endowed with certain powers and functions and property, the legislature reserving no interest in that which is given them, and no control over the succession of persons who form the corporation, or over the exercise of their functions, such a corporation is a private

corporation, to whom a franchise has been given by a grant which is an executed contract, and that any deprivation of their property, or any disturbance or denial of their rights and functions, impairs the obligations of contracts." 3 Pars. Cont. 531; College v. Woodward, 4 Wheat. 519. It is also "a settled rule of construction that public grants are to be construed strictly," and, where the public interest is concerned, "any ambiguity in the terms of the contract must operate against the company and in favor of the public." Richmond R'y Co. v. Louisa R'y Co., 13 How. 81. Chief Justice TANEY said: "The continued existence of a government would be of no great value if, by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation, and the functions it was designed to perform transferred to the hands of privileged corporations." Charles River Bridge v. Warren Bridge, 11 Pet. 584; also 2 Inst. 496; Canal Co. v. Wheeley, 2 Barn. & Adol. 792. In the case of Northern Pac. R'y Co. v. Traill Co., 115 U. S. 601, 6 Sup. Ct. Rep. 201, section 20 of the act creating the Northern Pacific Railroad Company, exactly similar to section 20 of the act under which the plaintiff company received its grant, was held to reserve to the United States the power to pass an act declaring that no land granted to the company should be conveyed, although earned, until the expense of survey of such lands had been paid by the company. It was urged that this last act was unconstitutional, upon the same ground as taken in the case at bar, and, indeed, it was so held by the supreme court of Minnesota; but the supreme court, by Justice MILLER, held that section 20 "conferred this power on congress," by which not only was the grantee divested of its lands, but the taxing power of a municipal government denied.

Did congress, by the mortgage act of 1871, extend the time during which the road might be completed?

It is strongly contended that this was the intent, and
is the effect, of the act in question.   There is some
GRANT of authori- ambiguity in the proviso of the act, and,
ty to mortgage there being necessity for judicial construc-
after breach of
condition.        tion, it is our duty, as we conceive it, to
consider the proviso in question together with the entire
act, as well as the granting act to which it refers.   It
is urged that the company possessed the power to mort-
gage its franchises, property, lands, etc., before this
declaration by congress.   This may be true, but there
was evidently some doubt upon the subject.   Power
was granted them expressly to sue and be sued, etc.,
and they were "vested with all the powers, privileges,
and immunities necessary to carry into effect the pur-
poses of this act as herein set forth."   As shown from
the record, the company had incurred a debt in 1871,
were compelled to secure funds, and the act was passed.
It is reasonable to presume that it was passed at the
request of the company.   Now, if it was the intention
of congress to do something more than affirm the right
to mortgage; if it was conscience stricken at the failure
of the government to comply with its contract, as is
urged—why was not a plain, direct declaration to this
effect made?   Why was the only intimation to this
effect contained in the act the following:   "Provided,
that if the company shall hereafter suffer any breach of
the conditions of the act above referred to, under which
it is organized, the rights of those claiming under any
mortgage," etc., "shall extend only to so much thereof
[lands] as shall be coterminous with, or appertain to,
that part of the said road which shall have been con-
structed at the time of the foreclosure of said mort-
gage?"   When this act was passed the company was in
default.   It had "suffered a breach" in having con-
structed in five years only thirty-four miles of road;
and, from the terms of the act, it is apparent that con-
gress intended to assure capitalists that no advantage

would be taken then of this breach, hence the use of the word "hereafter." If it was intended to grant further and indefinite time to the company in which to construct the road, why was the expression used, "hereafter suffer any breach of the conditions of the act above referred to under which it is organized?" Was this not clearly and distinctly a recognition and reaffirmance of the conditions under which the company acquired its grant, with an assurance that no advantage would be taken of the breach already suffered? Did not congress suppose, as a matter of course, that any mortgage would contain a condition of foreclosure upon breach of condition of the grant as well as upon failure to pay interest? Was this not done in the mortgages by the terms of which the party of the first part binds itself to construct the road with due diligence, and the second party reserves power to take possession and foreclose for any breach of the conditions of the mortgage? Would not any court construe "due diligence" in this case to mean within the time limited in the granting act? It has been strongly urged that up to the present time the mortgages could not have been foreclosed. This contention is not sustained by the facts as shown in the record. To sustain the contention of plaintiff, we must not consider any portion of the mortgage act except the last four words of the proviso. We must not consider at all the granting act. We must not look to the evident intention of the mortgagor and mortgagee, and their construction of the act. We must give the four words, standing alone, referred to, a strained construction, which would result in divesting the United States of forty-odd millions of acres of land forever, or at least during the pleasure of the mortgagees, without promoting in any sense the object for which the grant was made; and we must declare unconstitutional an act of congress, passed after mature deliberation, careful investigation, and with

a thorough knowledge of every phase of the case, as
shown by the report accompanying the forfeiture bill.
The grant would remain suspended in mid air, as it
were, until the Atchison, Topeka & Santa Fe Railroad
Company, bondholder, graciously saw fit to foreclose
its mortgage, or to construct the road at its own pleas-
ure; and in the meantime no settler could obtain a
homestead thereon, and no county or state revenue
could be derived therefrom by taxation.    The conten-
tion of plaintiff is equivalent to the proposition that
this mortgage act is a license coupled with a grant.
We think it a license, and, if correct, as Lord Chief
Justice VAUGHAN said in Thomas v. Sorrell, Vaughan,
330, "a dispensation or license properly passeth no
interest nor alters or transfers any property in any-
thing."    We construe this proviso by the rule laid
down by an eminent English chancellor:    "If you find
the first words have a clear meaning, but those that
follow are inconsistent with them, to reject the latter."
It is true that we must consider not only the contract
of the United States with the corporation, but also the
rights of parties contracting with the corporation.    2
Mor. Priv. Corp., sec. 1047;   Black, Const. Prohib. 16.
But here the mortgagee was by the very terms of the
mortgage act put upon notice of the condition of the
granting act, and further notified, as we construe it, to
this effect: "At the time of the foreclosure of your
mortgage, if a breach has been committed, your rights
will only pertain to lands actually earned at the time
we take advantage of such breach."    This construction
is not so much strained as that contended for by plain-
tiff, is in conformity with the best interests of public
policy, agrees with the conditions of the granting act,
and is in accord with the intent of congress as expressed
by the act of 1866 and the forfeiture act of 1886.

Where there are two statutes, the one granting
certain powers or privileges, and the latter extending

the power to different subjects, even without mention-
ing the limitations of the former act to the subject of
its grants, these limitations may by construction be
held to attach to the new subjects, when such construc-
tion is in consonance with the manifest intention of the
legislature.   Chamberlain v. Chamberlain, 43 N. Y. 424.

Mr. Justice Field said: "Instances without num-
ber exist when the meaning of words in a statute has
been enlarged or restricted and qualified to carry out
the intention of the legislature." Eureka Con. Min.
Co. v. Richmond Min. Co., 4 Sawy. 302; Reiche v.
Smythe, 13 Wall. 162.   Where the scope of a general
provision is the subject of consideration, there is always
a leaning, not only to prevent obscurity, but injustice,
for neither can be presumed to be intended.   Board v.
Spackman, 13 Q. B. Div. 878; Murray v. Gibson, 15
How. 421.   The intention of the act is what should be
sought for, and the intent will always prevail over the
literal sense of its terms.   Cearfoss v. State, 42 Md.
406; Reynolds v. Holland, 35 Ark. 56.   When two
portions of an act of legislative grant are repugnant or
in conflict, the established rule is that the former pre-
vails over the latter.   Fore v. Williams, 35 Miss. 522;
In re Second Ave. Church, 66 N. Y. —.   It seems
consonant with reason and good sense that a proviso,
being properly intended to limit the language of the
legislature, will not be construed to intend by doubtful
words to enlarge or extend the act or portion of an act
to which it is attached and this appears to be the set-
tled rule.   Suth. St. Const. 297; In re Webb, 24 How.
Pr. 247; U. S. v. Dickson, 15 Pet. 141; State v. Kelly,
34 N. J. Law, 75.   It being settled beyond contraven-
tion that a legislative grant is to be construed strictly
in favor of the state and against the grantee, it neces-
sarily follows that nothing will pass against the state
by implication.   Charles River Bridge v. Warren
Bridge, 11 Pet. 420; Rice v. Railroad Co., 1 Black,

358; Ruggles v. Illinois, 108 U. S. 536, 2 Sup. Ct.
Rep. 832; Gaines v. Coates, 51 Miss. 335; State v. South-
ern Pac. R. Co., 24 Tex. 80.   It is presumed always
that the lawmakers have a definite purpose in every
act.   We must presume here that the mortgage act of ·
1871 was passed with a full understanding of the pro-
visions and legal effect of the act of 1866; and that
when congress proceeded to pass the act of 1886, for-
feiting the unearned lands, but "having due regard for
the rights of the grantee," it was familiar with both
the prior acts and legislated knowingly.   A part of
one of these acts must be construed with reference to
the others upon the same subject.   If inconsistent, we
must attempt to harmonize; if the wording is unam-
biguous, and the meaning clear, we would not be at
liberty to put a construction upon it evidently foreign
to the intent of the lawmakers, no matter what we
thought of the justice of it; but, if there is ambiguity
and uncertainty, to arrive at the intent we must con-
strue the whole act and that to which it refers together,
and are at liberty, certainly, to take into consideration
all other acts upon the same subject.   It has been well
said that the general intent of the statute is the key to
the meaning of the parts, and it is the established rule
that the intention of the whole act will control the con-
struction of the parts.   1 Kent, Com. 461; Ogden v.
Strong, 2 Paine, 584; Green v. State, 59 Md. 123;
Railroad Co. v. Alexandria, 17 Gratt. 176; Burke v.
Monroe Co., 77 Ill. 610; Stone v. Mayor, etc., 1 C. P.
Div. 691; Jennings v. Love, 24 Miss. 249; Garby v.
Harris, 7 Exch. 591; Reiche v. Smythe, 13 Wall. 162;
Williams v. McDonald, 3 Pin. 331. Power was reserved
to congress by sections 9 and 20 of the Act of 1866 to
forfeit the grant, or the unearned portion of the same,
upon breach.   The mortgage act of 1871 was declara-
tive of the right to mortgage the property of the com-
pany, including the lands, and also, apparently, in the

nature of an assurance that no advantage would be taken
of the breach already suffered.  The act of 1886, for-
feiting the unearned grant, was valid and constitutional.
Judgment below affirmed.

Freeman, J., concurs.

Lee, J. (dissenting).—This is an action of eject-
ment, brought by the plaintiff in error to recover pos-
session of one hundred and twenty acres of land sit-
uate in San Miguel county, New Mexico.  The plaintiff
claimed title under an act of congress of July 27, 1866,
granting lands to the Atlantic & Pacific Railroad Com-
pany, against which the defendant relied on the United
States patent issued December 10, 1891.  The case was
tried to a jury, which, under the direction of the court,
returned a verdict of not guilty, and judgment was
accordingly rendered thereon in favor of the defend-
ant.  Plaintiff sued out a writ of error to this court.
He has assigned as error the rulings of the district
court admitting in evidence defendant's patent, refus-
ing to direct the jury to find for plaintiff, refusing the
instructions requested by plaintiff, and directing the
jury to find for defendant.  These various rulings are
brought before this court for review by exceptions
properly taken.  It appears from an examination of
the record that they all raise substantially the same
question, and therefore it will not be necessary for us
to consider and pass upon them separately.  There is
no conflict in the testimony as to the facts upon which
the rights of the parties depend.  The facts appear to
be undisputed, and, so far as they are deemed material
to a decision of the case, are as follows:

The Atlantic & Pacific Railroad Company is a cor-
poration, created by act of congress, approved July
27, 1866, the essential provisions of which are as fol-
lows:  "Be it enacted," etc.:  "Section 1.  That John
Brown,  *  *  *  John C. Fremont,  *  *  *  and

all such other persons who shall or may be associated with them, and their successors, are hereby created and erected into a body corporate and politic, in deed and in law, by the name, style, and title of the Atlantic & Pacific Railroad Company, and by that name shall have perpetual succession, and shall be able to sue, plead and be impleaded, defend and be defended, in all courts of law and equity within the United States, and may make and have a common seal. And said corporation is hereby authorized and empowered to lay out, locate, construct, furnish, maintain and enjoy, a continuous railroad and telegraph line, with the appurtenances, namely: Beginning at or near the town of Springfield, in the state of Missouri, thence to the western boundary line of said state, and thence by the most eligible railroad route as shall be determined by said company, to a point on the Canadian River, thence to the town of Albuquerque, on the River del Norte, and thence, by way of the Agua Frio, or other suitable pass, to the head waters of the Colorado Chiquito, and thence, along the thirty-fifth parallel of latitude, as near as may be found most suitable for a railway route to the Colorado river, at such point as may be selected by said company for crossing; thence by the most practicable and eligible route, to the Pacific. The said company shall have the right to construct a branch from the point at which the road strikes the Canadian river eastwardly, along the most suitable route as selected, to a point in the western boundary line of Arkansas, at or near the town of Van Buren. And the said company is hereby vested with all the powers, privileges and immunities necessary to carry into effect the purposes of this act, as herein set forth. The capital stock of said company shall consist of one million shares of one hundred dollars each, which shall in all respects be deemed personal property, and shall be transferable in such manner as the laws of said cor-

poration shall provide." Then follow various details relating to the organization of the company. "Sec. 2. And be it further enacted: That the right of way through the public lands be, and the same is hereby, granted to the said Atlantic & Pacific Railroad Company, its successors and assigns, for the construction of a railroad and telegraph line as proposed; and the right, power, and authority is hereby given to said corporation to take from the public lands adjacent to the line of said road material of earth, stone, timber, etc., for the construction thereof. Said way is granted to said railroad to the extent of one hundred feet in width on each side of said railroad where it may pass through the public domain, including all necessary grounds for station buildings, workshops, depots, machine shops, switches, side tracks, turntables and water stations; and the right of way shall be exempt from taxation within the territories of the United States. The United States shall extinguish as rapidly as may be consistent with public policy and the welfare of the Indians, and only by their voluntary cession, the Indian title to all lands falling under the operation of this act and acquired in the donation to the road named in the act. Sec. 3. And be it further enacted: That there be, and hereby is, granted to the Atlantic & Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway and its branches, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it

passes through any state, and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preemption or other claims or rights, at the time the line of said road is designated by a plat thereof, filed in the office of the commissioner of the general land office." After a number of provisions which need not be quoted here, the section concludes: "And provided further, that no money shall be drawn from the treasury of the United States to aid in the construction of the said Atlantic & Pacific Railroad." Section 4 provides the manner in which the railroad shall be examined by commissioners and accepted, and patents for lands issue as the road is constructed. Section 5 provides how the road shall be built. "Sec. 6. And be it further enacted: That the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road after the general route shall be fixed, and as fast as may be required by the construction of said railroad, and the odd sections of land hereby granted shall not be liable to sale or entry, or preemption, before or after they are surveyed, except by said company, as provided in this act; but the provisions of the act of September, eighteen hundred and forty-one, granting preemption rights, and the acts amendatory thereof, and of the act entitled, 'An act to secure homesteads to actual settlers on the public domain,' approved May twenty, eighteen hundred and sixty-two, shall be, and the same are hereby extended to all other lands on the line of said road when surveyed, excepting those hereby granted to said company." "Sec. 8. And be it further enacted: That each and every grant, right, and privilege herein are so made and given to and accepted by said Atlantic & Pacific Railroad Company, upon and subject to the following conditions, namely: That the said company shall commence work on

said road within two years from the approval of this act by the president, and shall complete not less than fifty miles per year after the second year, and shall construct, equip, furnish, and complete the main line of the whole road by the fourth day of July, A. D. 1878. Sec. 9. And be it further enacted: That the United States make the several conditional grants herein, and that the said Atlantic & Pacific Railroad Company accept the same, upon the further condition that if the said company make any breach of the conditions hereof, and allow the same to continue for upwards of one year, then, in such case, at any time hereafter, the United States may do any and all acts and things which may be needful and necessary to insure a speedy completion of the said road." "Sec. 11. And be it further enacted: That said Atlantic & Pacific Railroad, or any part thereof, shall be a post route and military road, subject to the use of the United States for postal, military, naval, and all other government service, and also subject to such regulations as congress may impose, restricting the charges for such government transportation." "Sec. 19. And be it further enacted: That unless the said Atlantic & Pacific Railroad Company shall obtain bona fide subscriptions to the stock of said company to the amount of one million of dollars, with ten per centum paid, within two years after the passage of and approval of this act, it shall be null and void. Sec. 20. And be it further enacted: That the better to accomplish the object of this act, namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times, but particularly in time of war, the use and benefits of the same for postal, military, and other purposes, congress may, at any time, having due regard for the rights of the said Atlantic & Pacific Railroad Company, add to, alter, amend, or repeal this act."

The organization of the company and subscription to the stock seem to have been carried out, in accordance with the provisions of the act, to the satisfaction of the government, within the time fixed, and the company was in numerous ways afterward treated as being duly organized to do business and exercise the powers conferred by the act of incorporation. It proceeded to survey and locate its railroad line along the general route prescribed by congress, and from time to time the plats of location designating its line were filed with the secretary of the interior, as required. Thereupon, by executive orders under the direction of the president of the United States, the alternate sections of public land within the forty mile limits on each side of the located line were withdrawn from sale, entry, or preemption, as provided by section 6 of the act of congress. Such withdrawal of lands in the territory of New Mexico was made by letter of the secretary of the interior May 8, 1872, to take effect from March 12, 1872, the date of the filing of the location plats; and the lands within the grant limits from there westward to the Pacific ocean were similarly withdrawn, to take effect at various dates in the year 1872. The price of the public lands in the even numbered sections within the grant limits, which were retained by the government, was increased to double minimum, or $2.50 per acre. By the eighth section of the Act of July 27, 1866, the company was required to commence construction within two years from that date, and build not less than fifty miles of railroad per year thereafter. Up to April 20, 1871, it had built only seventy-five miles of road. On that date congress passed an additional act authorizing the company to mortgage its road, franchises, lands, and other property to secure bonds to be issued to raise money for construction. That act is as follows: "An act to enable the Atlantic & Pacific Railroad Company to mortgage its road. Be it enacted," etc.: "That the

Atlantic & Pacific Railroad Company, organized under act of congress of July twenty-seventh, eighteen hundred and sixty-six, is hereby authorized to make and issue its bonds in such form and manner, for such sums, payable at such times, and bearing such rate of interest, and to dispose of them on such terms as its directors may deem advisable; and to secure such bonds, the said company may mortgage its road, equipment, lands, franchises, privileges, and other rights and property, subject to such terms, conditions, and limitations, as its directors may prescribe. As proof and notice of the legal execution and effectual delivery of any mortgage hereafter made by said company, it shall be filed and recorded in the office of the secretary of the interior; provided, that if the company shall hereafter suffer any breach of the conditions of the act above referred to, under which it is organized, the rights of those claiming under any mortgage made by the company to the lands granted to it by said act shall extend only to so much thereof as shall be coterminous with, or appertain to, that part of said road which shall have been constructed at the time of the foreclosure of said mortgage.'" Under the authority of this act the company executed mortgages covering the road and lands from Missouri to Albuquerque, New Mexico, to secure bonds to the aggregate amount of $3,590,629, and from Albuquerque to San Francisco to $16,000,000. The first of these includes the lands in controversy. These mortgages were duly executed and recorded in the office of the secretary of the interior, as required by the act. The bonds secured by them fall due at different dates from 1901 to 1922. The bonds were sold and the moneys realized from their sale used toward the construction of the road. They are still outstanding and none of them will de due, according to their terms, before 1901. The interest has been paid. No default as to any of the mortgages has occurred, and none of

them have been foreclosed, nor by their terms could
have been, or can now be, foreclosed.  By the fourth
day of July, 1878,—the date fixed by the act of 1866
for the completion of the road,—the company had
only constructed one hundred and twenty-five miles
westward from Springfield, Missouri, the beginning
point of the line.  Afterward, and prior to July 6,
1886, it built fifty miles more in the Indian Territory,
and five hundred and sixty miles westward from Albu-
querque to the Needles on the Colorado river, all of
which was examined and accepted by order of the pres-
ident of the United States.  It also acquired by contract
of purchase two hundred and forty-three miles of road
upon its located line from the Needles to Mojave, Cali-
fornia, which had been constructed by the Southern
Pacific Railroad Company.  The intervening portion
of the line from Sepulpa, in the Indian Territory, to
Albuquerque, and from Mojave to San Francisco, in
California, were in 1886, and still remain, uncon-
structed.

On July 6, 1886, congress passed an act to forfeit
the land grant to the Atlantic & Pacific Railroad Com-
pany appertaining to the unconstructed portion of its
railroad line, and restored the land to settlement, which
act is as follows:   "An act to forfeit the lands granted
to the Atlantic & Pacific Railroad Company to aid in
the construction of a railroad and telegraph line from
the states of Missouri and Arkansas to the Pacific
coast, and to restore the same to settlement, and for
other purposes.  Be it enacted by the senate and house
of representatives of the United States of America, in
congress assembled, that all the lands, excepting
the right of way and the right, power, and authority
given to said corporation to take from the public lands
adjacent to the line of said road material of earth, stone,
timber, and so forth, for the construction thereof,
including all necessary grounds for station buildings,

workshops, depots, machine shops, switches, side tracks, turntables and water stations, heretofore granted to the Atlantic & Pacific Railroad Company, by an act entitled, 'An act granting lands to aid in the construction of a railroad and telegraph line from the states of Missouri and Arkansas to the Pacific coast,' approved July twenty-seventh, eighteen hundred and sixty-six, and subsequent acts and joint resolutions of congress, which are adjacent to, and coterminous with, the uncompleted portions of the main line of said road, embraced within both the granted and indemnity limits, as contemplated to be constructed under and by the provisions of the said act of July twenty-seventh, eighteen hundred and sixty-six, and acts and joint resolutions subsequent thereto and relating to the construction of said road and telegraph, be and the same are hereby, declared forfeited and restored to the public domain. Approved July 6, 1886." Upon the passage of this act, all the lands within the grant limits which had been withdrawn from entry and sale by executive orders, as before stated, and which were opposite those portions of the railroad line not then constructed, were by order of the interior department declared to be restored to the public domain, and open for settlement and entry under the land laws. This included, among others, all the lands from the eastern boundary of New Mexico to Albuquerque, within which was the tract in controversy in this suit. This tract is shown by the testimony of the receiver of the land office of the district in which it is situated to be nonmineral public land, to which, on March 12, 1872, the United States had full title, and which at that date was not reserved, sold, granted, or otherwise appropriated by the United States, and was free from preemption or other rights or claims. It is part of an odd numbered section within the forty mile limits of the Atlantic & Pacific grant. It therefore, falls within the class of lands which by the

act of 1866 was granted to the Atlantic & Pacific Railroad Company, and as such was specifically included in the order of withdrawal of March 12, 1872, and from which withdrawal it was subsequently, after the act of July 6, 1886, released, and restored to entry. It was entered as a preemption January 9, 1888, and patented to the grantor of defendant December 10, 1891.

Upon this state of facts the sole question in the record is whether the title of the plaintiff company to the land in controversy acquired by the act of July 27, 1866, was divested by the forfeiture act of July 6, 1886. If it was, then the plaintiff at the commencement of the suit had no title, defendant's patent was valid, and he was entitled to verdict and judgment. If it was not, then defendant's patent was void, and should have been excluded; while plaintiff's title was good, and the district court should have directed a verdict in its favor and given judgment accordingly. The act of July 6, 1886, on its face undoubtedly purports to divest the title of the railroad company to the land, and restore it to the public domain. It does not provide for any subsequent proceedings of any kind to effect a forfeiture, nor is it simply a declaration by congress of the intention of the United States to treat the grant as forfeited for failure to perform the conditions. It declares the lands forfeited absolutely, and restored to the public domain, and the executive branch of the government has dealt with the lands as being the property of the United States. Therefore, it is not a question of the construction of the act, but of its validity. If the act, for the purpose it professes to accomplish, is within the constitutional powers of congress, then it operated to divest the title of the plaintiff, and the judgment of the district court must be affirmed. If not, the plaintiff's title is good, and the judgment of the court below was erroneous. This is the only question in the case. This question, although thus reduced to a simple form, is

the most serious that a court can be called upon to decide. The power to declare void an act of the highest legislative body of the government is an extraordinary one, and it is well settled that such power is only to be exercised where it is perfectly clear and free from doubt that the act in question is beyond the powers conferred on congress by the constitution, or is within its prohibitions. The respect due to the legislative branch of the government requires its acts should not be questioned except for the strongest and clearest reasons; and, on the other hand, private rights, which are guarantied by the constitution, are equally entitled to respect, and when it is plain that they have been infringed, courts should not hesitate to protect them. Whatever conclusion is reached, it should only be after grave consideration, with full sense of the responsibility which a decision of the question involves. This we have endeavored to give it.

As to the title acquired by the plaintiff under the original granting act of 1866, without reference to subsequent legislation, there will be no necessity for extended discussion. The language of the act in section 3 is: "That there be, and hereby is, granted to the Atlantic & Pacific Railroad Company," etc., "every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty sections per mile, on each side of said railroad line," etc. This is the same language that has been used in various other congressional railroad grants, and it has been construed by the supreme court of the United States in a number of cases. The effect of the granting clause is held to be to pass the legal title to the grantee, so that it attaches to the specific lands upon filing the plats of location, and relates back to the date of the act. Schulenberg v. Harriman, 21 Wall. 44, 60; Leavenworth, etc., R. Co. v. U. S., 92 U. S. 733, 741; Buttz v. Railroad Co., 119 U. S. 55, 66–73, 7 Sup. Ct.

Rep. 100; Wright v. Roseberry, 121 U. S. 488, 496–509, 7 Sup. Ct. Rep. 985; St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 5, 11 Sup. Ct. Rep. 389; Salt Co. v. Tarpey, 142 U. S. 241, 245–250, 12 Sup. Ct. Rep. 158; U. S. v. Southern Pac. R. Co., 146 U. S. 593, 13 Sup. Ct. Rep. 163. The court has also passed upon this identical grant in the case of U. S. v. Southern Pac. R. Co., 146 U. S. 593, 13 Sup. Ct. Rep. 163, holding in the light of its previous decisions, that the act of congress made a grant in praesenti, and uses the following language: "Applying these well settled rules in the cases at bar, there can be little difficulty in arriving at a conclusion. The grant to the Atlantic & Pacific was made in 1866; to the Southern Pacific in 1871. They were grants in praesenti. When maps of definite location were filed and approved, the grants severally took effect by relation as of the dates of the acts. The map of definite location of the Atlantic & Pacific Company's road along the lands in controversy was filed and approved on April 11, 1872. Then the specific tracts were designated, and to them the title of the Atlantic & Pacific attached as of July 27, 1866. If anything in the land laws of the United States can be considered as thoroughly settled by repeated decisions, it is this." That court also holds that the title of the grantee under such grants was superior to that under a United States patent issued for lands within the grant, so long as it was still in force; and that a patent, issued under such circumstances, is void, and may be attacked in a court of law. Wright v. Roseberry, 121 U. S. 488, 7 Sup. Ct. Rep. 985. It may be considered as settled on the authority of these decisions that the plaintiff's title under the grant of 1866 would be sufficient to enable him to recover in this action, unless it has been divested by the forfeiture act of 1886.

It is claimed by defendant in error that the act of

July 6, 1886, operated in law to do just what it states on its face, viz., to forfeit the lands which had been granted by the act of 1866, and restores them to the public domain.   His position is that the grant was a conditional one, and that upon breach of the conditions the United States had the right and power to forfeit the grant.   His contention is fully elaborated in the brief of his counsel, where it is here recapitulated as follows: First. That the final clause of section 9 of the Act of 1866 is in legal effect an express reservation of the right of congress to declare a forfeiture.   Second. That under the conditions stated in section 9, when the same were broken, even without any express reservation in the act of the right of the government to declare a forfeiture, congress might, as a legal result of the broken conditions, declare such forfeiture. Third.  That in the grant of lands by the United States, in order to preserve the right of forfeiture, it is no more necessary to expressly reserve such right upon nonperformance of the condition in the act than it is at common law in a deed conveying lands with a condition subsequent to expressly reserve a right to enter on condition broken; but in both cases the right to do the act operating to make the forfeiture arising from nonperformance effective results as a legal incident from the nonperformance of the condition. Fourth. That, in the absence of any express reservation of the power to declare a forfeiture of the grant in question, the courts may maintain the right of congress, upon breach of the condition, to declare a forfeiture on the ground of public policy alone.   Fifth. That the mortgage act of 1871 is only declarative of the common law right to mortgage, and was enacted for the sole purpose of removing all doubt on that subject, to thereby aid the company to proceed with construction; and that it was not intended by said act to enlarge the rights of the company or to subordinate

the interests of the government in the lands to the rights of future mortgagees. Sixth. That persons holding mortgages on said lands took only the title vested in the company at the date of the several mortgages, and subject to the right of the United States to declare the lands forfeited for nonperformance of the conditions subsequent, except such lands as might be coterminous with construction. Seventh. That the rights of mortgagees can not be considered in this action, as no interest under any mortgage is set up by the plaintiff, but only the interests acquired under the act of 1866. Eighth. That the case of Railway Co. v. Esquibel, 5 N. M. 123, is conclusive in this court against the plaintiff. Defendant's counsel further refer to the decision of this court in the case of Railway Co. v. Esquibel, 5 N. M. 123, upon a similar clause in the Texas Pacific act, as conclusive of the proposition that this clause was for the benefit of the government, and not of the grantee, and that the railroad company can not be heard to say that the forfeiture of the land grant is not a proper measure to secure the completion of the road.

The contention of plaintiff in error is briefly this: That the estate granted by the act of July 27, 1866, is one upon condition subsequent. That while, at common law, in the absence of any express provision upon the subject, the right of the grantor to forfeit the estate for breach of condition undoubtedly exists, yet if the granting act, at the same time that it specifies the conditions, also declares what shall be the effect of a breach of them, such declaration of the consequence of a breach becomes as much a part of the condition as the act or omission itself. That the only conditions imposed by the granting act were: First, in the eighth section, that the railroad must be commenced within two years, prosecuted at the rate of at least fifty miles per year thereafter, and be finished by July 4,

1878; and, second, in the nineteenth section, that the
company must obtain bona fide subscriptions to its
stock to the amount of a million dollars within two
years, with ten per cent paid in. That as to the
second of these it was expressly provided that, if not
done within the time fixed, the act shall be null and
void. That the first condition—of construction within
a fixed time—is the same that has been attached to all
the grants by congress in aid of railroads or similar
works, and that all such grants,—being over thirty in
number,—with the exception of this and two others,
have contained the further express condition that if
the road or work should not be completed within the
time fixed by the act the lands granted should revert to
the United States. That after legislating in this sense
since 1850, including nine other railroad grants made
at the same session of congress in 1866, congress made
a radical change in the corresponding condition as to
the Atlantic & Pacific grant, by omitting the usual
words providing for reversion or forfeiture of the lands
to the United States in case of breach of the condition,
and inserting in its place an express provision, specify-
ing as a further condition on which the grant is made
by the United States and accepted by the company
that in case of breach of the conditions continuing for
a year "the United States may do any and all acts and
things which may be needful and necessary to insure a
speedy completion of the said road." That by this
change from legislative expression, sanctioned by long
and continuous use in acts upon the same subject, to
one entirely different, congress intended that the rights
and liabilities of the parties should likewise be different
in respect to the matters thus changed. That by ex-
pressly omitting the customary provision for reversion
of the lands to the United States, and providing some-
thing else as the consequence of a breach of condition,
congress excluded the idea of forfeiture, and limited

the effect of a breach to the one specified. That the specification of the consequence mentioned necessarily implies that the general power of forfeiture was not intended to be reserved, because, if the latter existed, it would include all other powers with reference to the lands, and a reservation of lesser powers, necessarily so included, would be unnecessary. That by excluding, in contradiction to its previously established policy on this subject, the provision for reversion, and specifying something else, it became a part of the condition that the effect of the breach should be limited to the one so specified, and all other conditions must be read with this one attached. That by the ninth section the United States renounced any right it might otherwise have had to forfeit the grant, except it should be in furtherance of the completion of the road; and that to come within this reservation the act of forfeiture must be for that declared purpose, whereas the forfeiture act of 1886 is by its title avowedly for the purpose of opening the lands to settlement, and not in connection with any plan or proposal for completion of the road. Plaintiff in error also contends, and has introduced a large amount of evidence in an effort to show it, that the government, by failing to extinguish the Indian titles, and to survey the lands as earned by construction, and by locating new Indian reservations upon the line of the road and within its grant limits since the definite location of the line, is primarily responsible for the delay in construction, and that the performance of the conditions on part of the company can not be strictly required, or a breach declared for nonperformance, until the government has performed its own undertaking. We shall not attempt a review of this evidence, nor to determine whether the facts alleged on the point are or are not proven; nor whether, if proven, they can be availed of by the plaintiff in error to shield it from forfeiture of its land grant. In

view of the conclusion at which we have arrived, it is not necessary to do so.

If these were the only questions in the case, the decision, so far as this court is concerned, might not be difficult. While there is much force in the argument for plaintiff in error that by the eighth and ninth sections of the Act of 1866 the general power of forfeiture by the grantor was waived, and the remedy for breach of condition limited to that stated in the last clause of section 9, nevertheless, as the same language has been heretofore construed by this court in the Texas Pacific act, we should be disposed to follow the decision in Railway Co. v. Esquibel, supra, and hold that the railroad company, in default as to the completion of the road, could not be heard to say that forfeiture is not an act deemed needful by the United States to insure the completion of the road. But counsel for plaintiff in error further contends that the act of 1871, authorizing the company to mortgage its road, franchises, and land grant, passed after the company was already in default as to construction at the yearly rate required by the granting act, not only negatived any intention of congress by the act of 1866 to forfeit the grant for nonperformance of the condition, but was such an alteration of the original contract as to introduce new conditions, whereby the United States has postponed its right to take any steps under section 9 until a time that has not yet arrived. His argument, more fully developed orally than in the brief, is that, while the power to mortgage the lands existed without express authorization, yet a mortgage so executed would only create a lien on the lands, burdened with the condition that upon failure of the company to build fifty miles per year, or to complete the road by July 4, 1878, the government might take measures toward insuring its completion. What those measures might be could not be certainly told beforehand. The line on which the

road was required to be built was to a great extent
through an Indian country, in a part of which in 1871,
and for some years afterward, the Indians were in a
state of active hostility.    Much of the country was also
of doubtful value, either for local business or for selling
lands.    But the government wanted to get this road
built by private capital, without the aid or security of
government money or credit, such as had been given to
the Union and Central Pacific roads.    It was useless to
ask private investors to put their money into bonds
secured by mortgage on lands and franchises as to
which, if not completed by 1878, the government
would have the right to take steps of unknown charac-
ter toward its completion.    Nobody would take such a
risk.    To say nothing of the extinguishment of Indian
titles, which was contemplated by the act, there was no
assurance that the hostile Indians would be subdued,
so as to allow construction to go on within the time
fixed, which in fact was not done as to the Comanches
for four or five years after 1871.    Therefore, in order
to offer a security which the public could afford to
accept, and at the same time to reserve protection to
the government in the ultimate application of the lands
to construction and completion of the road, congress,
by the mortgage act, altered the condition as to time
of construction, so that, instead of July 4, 1878, the
time for construction as to the road mortgaged was
extended to the date of the foreclosure of the mortgage,
and the rights of mortgagees under such mortgage
should only extend to lands coterminous with the road
constructed at that date.    Hence, as to the lands cov-
ered by any mortgage executed pursuant to this act,
there is no breach of condition as to time of construc-
tion until the date of foreclosure; and the United
States, by the terms of the act of 1866, as altered by
the act of 1871, has agreed that as to lands so mort-
gaged it will take no steps under section 9, except as to

lands which may be found opposite road unconstructed when the mortgage is, or by its terms can be and ought to be, foreclosed. That for this reason, as to lands so mortgaged, there has been no breach of conditions, and the right of the United States to take steps of its own to complete the road has not yet attached. That the right and duty of the company, or, on its default, of the mortgagees, to go on with the construction, still continues. That the estate created by the act of 1866 remains in the company, subject to the rights of the mortgagees, and in case of ultimate default of both, subject to the right of the government; and that in the meantime it is the right of the company, for the preservation of the security of its mortgages, to maintain the possession which follows the legal title.

We have given to this contention, as well as the answer to it by defendant's counsel, and the argument of the committees of congress on the effect of this mortgage act, our most earnest consideration, with a view to ascertain its true meaning and legal effect, and the rights of the parties that grow out of it. In the first place, it is quite clear that it introduces a new feature, which was not in the case of Railway Co. v. Esquibel, and that with this mortgage act before us the decision of that case furnishes no guide to a solution of the question now presented. Nor have we been referred to any case in which such a clause has been directly construed. The act of April 20, 1871, has been already quoted in full, but we give again the proviso, on which the question turns: "Provided, that if the company shall hereafter suffer any breach of the conditions of the act above referred to, under which it is organized, the rights of those claiming under any mortgage made by the company to the lands granted to it by said act shall extend only to so much thereof as shall be coterminous with or appertain to that part of said road which shall have been constructed at the

time of the foreclosure of said mortgage." If this
were part of a deed between private individuals, we do
not think there would be any controversy as to its mean-
ing. It seems to be insisted that because these words
are found in an act of congress they must be construed
in some way so as to deprive them of their usual sig-
nification, and introduce some meaning different from
that expressed by the words themselves. We under-
stood that the rule of construction of public grants is
different from that of private grants, in this: that the
latter are to be construed most strongly against the
grantor, and the former most strongly against the
grantee; but this only applies to cases where the lan-
guage is doubtful or ambiguous. It does not go to the
extent of changing the clear meaning of words in
either case. It will not, by mere intendment, supply
words to confer rights, powers, or property upon the
grantee of a private deed, nor strike out words of clear
and obvious meaning, in order to withhold these from
the grantee of a public grant. Where the language is
plain, and free from ambiguity, there is no necessity
for interpretation, because the words speak for them-
selves. The supreme court of the United States has
laid down the rule for the construction of grants of
this character so plainly that there can be no difficulty
in understanding and following it. In Leavenworth,
etc., R. Co. v. U. S., 92 U. S. 740, having under con-
sideration a railroad grant to the state of Kansas, the
court said: "This grant, like that to Iowa, was made
for the purpose of aiding a work of internal improve-
ment, and does not extend beyond the meaning and
intent expressed in it. It should be neither enlarged
by ingenious reasoning, nor diminished by strained
construction. The construction must be reasonable,
and such as will give effect to the intention of con-
gress. This is to be ascertained from the terms em-
ployed, the situation of the parties, and the nature

of the grant. If these terms are plain and unambiguous, there can be no difficulty in interpreting the act; but if they admit of different meanings, the one of extention and the one of limitation, they must be accepted in the sense most favorable to the grantor." Counsel for defendant in error say "that the mortgage act of 1871 is only declaratory of the common law right to mortgage, and was enacted for the sole purpose of removing all doubt on that subject, to thereby aid the company to proceed with construction; and it was not intended by said act to enlarge the rights of the company, or limit the power of congress to declare the grant forfeited, or to subordinate the interests of the government in the lands to the rights of future mortgagees." We do not perceive how this can be the case unless the words, "at the time of foreclosure of said mortgage," at the conclusion of the mortgage act, are stricken out, and in their place inserted, "at the time of the breach of condition," or something equivalent to them. By no conceivable process of reasoning can it be made out that the two phrases above quoted mean the same thing. Nor can we see, if the latter meaning were given to the proviso, what was the occasion for the passage of the mortgage act at all. The company had already a common law right to mortgage whatever title it had and the mortgagee would take his lien subject to whatever conditions and resulting penalties attached under the original act of 1866. If the act of 1871 did not offer to mortgagees something more than they could get without it, there was certainly neither sense nor reason in its passage. If it was not the purpose of the act to extend the time for completion to roads coterminous with the mortgaged lands, then why was anything said about date of foreclosure. If the intention of congress was only to give the mortgagees a lien subject to the breach of conditions as already specified in the act of 1866, how is it possible to explain the

omission of the plain, direct, and easy words to express that intention, and the insertion of other words which bear no possible relation to it, or under certain contingencies would be absolutely inconsistent with it? The words used are not obscure. They have a well understood meaning, both technically and in common use. If used in an ordinary conveyance or transaction, nobody would hesitate for a moment to say what they mean. They are, both by themselves and in connection with the subject-matter and context, plain and unambiguous. This fact, together with the entire absence of reason or purpose in the act which would follow from giving it the forced and unnatural construction contended for, leads us to conclude that the proviso means simply what it says, and that it was intended and does operate to enlarge the condition of the grant as to the mortgaged lands. We do not see that it made any change as to the effect of a breach of the conditions of the grant. What the United State might or could do in the way of steps toward the completion of the road in case of a breach and continuance thereof for one year remained as uncertain as before, but it nevertheless remained. But whatever this right or power was, the mortgage act amounted to a declaration by the United States to prospective mortgagees, having all the force of a contract, that the company, or they for it, should have until the date of the foreclosure to complete the road before such power could be exercised.

The word "only," in ordinary use, is a term of restriction, and not of extension; and its use, in this proviso seems to imply that under an express general power to mortgage the rights and lien of the mortgagees, might have been even more extensive, if it had not been limited in this way to the time of foreclosure. From these considerations, it is our opinion that the act of April 20, 1871, together with the act of 1866, as altered or amended by it, constituted a contract, under

which the mortgagees acquired vested rights in the lands covered by their mortgages to have them preserved as to title and possession for their ultimate security to the extent they may be found applicable on account of construction at the date of foreclosure of the mortgages; and that any legislation which withdraws from them the security of the lands, devotes them to other purposes, and turns over their possession to hostile hands, is destructive of those rights. Said Mr. Justice STRONG, in the Sinking Fund Cases, 99 U. S. 727: "There is no technicality about vested rights. Most of them grow out of contracts; and, no matter how they arise, they are equally sacred, equally beyond the reach of legislative interference." Mr. Justice FIELD, in the same case, said: "Contracts are property, and a large portion of the wealth of the country exists in that form. Whatever impairs their value diminishes, therefore, the property of the owner; and if that be effected by direct legislative action operating on the contract, forbidding its enforcement or transfer, or otherwise restricting its use, the owner is as much deprived of his property without due process of law as if the contract were impounded, or the value it represents were in terms wholly or partially confiscated." And Mr. Justice BRADLEY, in the same case, to a similar purport, said: "A contract is property. To destroy it wholly or to destroy it partially is to take it; and to do this by arbitrary legislative action is to do it without due process of law." Is such legislation, which thus impairs or destroys vested rights, valid or effectual, and should it be upheld by the courts? The supreme court of the United States, in the Sinking Fund cases, above cited, which arose upon the grant in aid of the Union and Central Pacific Railroads, has answered the question in the negative, saying: "It is our duty, when required by the regular course of judicial proceedings, to declare an act of

congress void if not within the legislative power of the United States; but this declaration should never be made except in a clear case." "The United States can not, any more than a state, interfere with private rights, except for legitimate governmental purposes. They are not included within the constitutional prohibition which prevents states from passing laws impairing the obligation of contracts, but, equally with the states, they are prohibited from depriving persons or corporations of property without due process of law. They can not legislate back to themselves, without making compensation, the lands they have given this corporation to aid in the construction of its railroad. * * * The United States are as much bound by their contracts as individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a state or a municipality or a citizen. No change can be made in the title created by the grant of the lands, or in the contract for the subsidy bonds, without the consent of the corporation. All this is indisputable." This authority from the highest court in the government is conclusive, and there is no necessity for further citations on this proposition.

The act of July 6, 1886, is upon its face an absolute legislative forfeiture. It can not be said to be a measure designed in any way to promote the construction or completion of the road. Its declared purpose is to "forfeit the lands granted to the Atlantic & Pacific Railroad Company, * * * and to restore the same to settlement." It contains no suggestion of any intention to devote the lands to the completion of the road in some other way, or by some other agency, such as granting them to another company that would finish the road, or setting apart the proceeds of their sale as a fund or subsidy therefor. Nor, though seven

years have elapsed since its passage, has any step in that direction been taken. The act contains no provision for the protection, preservation, or reservation of the vested rights of the mortgagees, nor makes the disposition of the lands subject to these rights. By opening the lands to settlement it is evident that congress entirely ignored the rights of the mortgagees to any of the land, or any interest or security therein; since in no way could the government more completely take the lands away from the reach of the mortgagee than by disposing of them to others under a United States patent, as in this case. If our contention as to the rights of the mortgagees and of the company for their benefit is correct, then they constitute property which can not be thus taken away by legislative act. The forfeiture can not be justified under the power of repeal contained in section 20 of the act of 1866. The power of alteration, amendment, or repeal reserved by that section was by the same section expressly declared to be "with due regard for the rights of the Atlantic & Pacific Railroad Company," and, furthermore, such power was reserved, in the language of that section, "the better to accomplish the object of this act, namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times, but particularly in time of war, the use and benefits of the same for postal, military, and other purposes." A forfeiture of the lands, however strong the reasons therefor which restores them to settlement, can not be held to fall within any of the purposes of this section; and, whatever its intention, the power of alteration or repeal is by its own terms, and would be anyhow, subject to the rights which have become vested under the granting act and the mortgage act.

The question is a very extensive one, and we might discuss the arguments presented on both sides at greater length, but, as the conclusion at which we have arrived is decisive of the case with us, we do not think it necessary to prolong this opinion. It is our opinion that the act of July 27, 1866, was a grant in praesenti to the Atlantic & Pacific Railroad Company of the odd numbered sections within forty miles on each side of the line when located; that upon filing plats of definite location, March 12, 1872, the grant became definite, and attached to specific lands, and the legal title passed to the grantee by relation as of the date of the act, with a condition subsequent attached that, if the company failed to complete the road by July 4, 1878, the United States might do such acts as it might deem needful to insure the speedy completion of the road; that by the act of 1871 the company was authorized to mortgage the land so granted to it, and as to lands so mortgaged the condition of completion was enlarged until the time of foreclosure of such mortgage, and the estate created by the granting act in such lands could not be divested by any act or means until that time; that the act of July 6, 1886, did not operate to divest the estate as to such lands vested in the mortgagees, and can only be construed as a declaration of the government to resume the granted lands at such time and by such means as it lawfully can by some due process of law, which has not yet been provided. As the land in controversy falls within the above category, it follows that the plaintiff's title must prevail, and the judgment of the district court must be reversed.

It only remains to consider what judgment should be rendered. The case, as it involves the construction of a United States statute, is one which can be appealed to the supreme court of the United States, and we suppose will be. If the cause were remanded for a

new trial, the district court, under our decision, could do nothing else than direct a verdict and enter judgment for the plaintiff. The facts are not in dispute, and are fully exhibited in the record, and in no possible aspect of the case could there be any other judgment than such as above stated by direction of the court. It would be imposing useless expense and delay to remand the case simply to go through these idle forms. It is well settled that in such a case the appellate court may properly direct the lower court to enter a specific judgment, or may render final judgment itself. In Elliott on Appellate Procedure (section 567), it is stated that "when the facts are not in controversy, and are fully exhibited by the record, the appellate tribunal may direct the specific judgment that shall be rendered. As the object of the law is to put an end to litigation, the power to direct what specific judgment shall be entered is one to be liberally exercised in furtherance of justice. It has been often exercised." And in section 564 the same author says: "The appellate tribunal may pronounce the ultimate judgment without remanding the case, where the facts are not in dispute, unless the statute requires that the case should be remanded. In Insurance Co. v. Scammon, 123 Ill. 601, 14 N. E. Rep. 666, the court says: "Where the evidence given at the trial, with all the inferences which the jury could justifiably draw from it, was so insufficient to support the verdict, that the trial court would have been warranted in directing them to find for the defendant, but failed to do so, then, and then only, can the appellate court reverse without remanding; because, in such case, it merely renders the judgment that should have been rendered in the trial court." In Pennington v. Underwood, 19 S. W. Rep. 108, the supreme court of Arkansas, under a statute authorizing it to remand, dismiss, or render such other judgment as the court in its discretion

might deem just, said: "Where there is on the record an affirmative showing upon facts undisputed that the plaintiff has no right to recover, the supreme court should not order a new trial, which would only protract the litigation, increase the costs, and needlessly occupy the time of the courts. In such case injustice would be done by remanding the cause, while justice would be done by determining it now." And the court entered final judgment. We have a statute which directly authorizes such a course. Section 2190 of the Compiled Laws of 1884 provides as follows: "The supreme court in appeals or writs of error shall examine the record, and on the facts therein contained alone shall award a new trial, reverse or affirm the judgment of the district court, or give such other judgment as to them shall seem agreeable to law." For these reasons we think it would serve no good purpose to remand the case for further proceedings in conformity with this opinion, but that it will be better for all parties, and tend to secure a more speedy and conclusive determination of the questions of law involved, if judgment is entered in this court in favor of the plaintiff for the possession of the land described in the declaration.

SEEDS, J., concurs.